

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-07-184-CV

IN THE INTEREST OF J.P.C., A CHILD

------------

FROM THE 324TH DISTRICT COURT OF TARRANT COUNTY

------------

## OPINION

------------

### I. Introduction

In one issue, Appellant Dayna Kay C. argues that the trial court abused its discretion when it granted Appellees Richard and Maurine C.'s petition for grandparent access. We reverse and render.

### II. Factual and Procedural History

Dayna and Robert C. were married May 20, 1996. They had one child, J.P.C., who was born March 29, 1999. Dayna filed for divorce from Robert in May 2002. After the divorce was filed, Robert went to live with his parents,

Richard and Maurine C. ("the grandparents"). Subsequently, the trial court entered temporary orders awarding Dayna primary managing conservatorship and awarding Robert standard possession subject to the grandparents' supervision.

In March or April 2003, the divorce proceedings were halted when Robert was diagnosed with a terminal disease. Robert died on May 9, 2004. J.P.C. was five years old at the time. On May 18, 2004, the grandparents filed an original petition for grandparent access. On January 31, 2007, the trial court issued a rendition letter granting the grandparents possession of and access to J.P.C. On May 18, 2007, the trial court signed its order granting the grandparents possession and access. J.P.C. was eight years old at that time. Dayna brought this appeal.

### III. Standard of Review

Before we determine the merits of Dayna's appeal, we must first decide what standard of review applies to a trial court's determination of grandparent access and possession under section 153.433 of the Texas Family Code.[1] TEX.

---

[1] While both parties assert that the trial court's determination of grandparent access and possession is reviewed under an abuse of discretion standard, they do not cite, nor have we found, any authority specifically applying an abuse of discretion review to section 153.433 appeals. Therefore, we address the issue as a threshold matter here.

FAM. CODE ANN. § 153.433 (Vernon Supp. 2008). Although section 153.433 does not specifically include a best interest analysis, section 153.002 dictates that the best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child. *Id.* The determination of a minor's best interest requires the court to balance the possible benefits and detriments to the minor in granting grandparent access and possession.[2] This type of balancing necessarily involves the exercise of judicial discretion and should be reviewed on that basis. *See In re Doe 2,* 19 S.W.3d at 281*.* Moreover, this type of review is used in many other family law contexts; for instance, in child support, adoption, and custody cases the trial court's best interest finding is reviewed for an abuse of discretion.[3] *Id.* Because of the discretionary nature of the trial court's determination and the similarity to review of best interest findings in other family law contexts, we hold that abuse of discretion is the proper

---

[2] *Cf. In re Doe 2,* 19 S.W.3d 278, 281 (Tex. 2000) (observing that, in evaluating a minor's request for waiver of parental notification to obtain an abortion, the trial court's determination of the minor's best interests require that the trial court balance the possible benefits and detriments to the minor in notifying her parents).

[3] *See, e.g., Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990); *In re W.E.R.*, 669 S.W.2d 716, 716 (Tex. 1984); *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982).

standard of review for a trial court's determination regarding grandparent access and possession.

To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985), *cert. denied*, 476 U.S. 1159 (1986). Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Id*. An abuse of discretion does not occur where the trial court bases its decisions on conflicting evidence. *In re Barber*, 982 S.W.2d 364, 366 (Tex. 1998) (orig. proceeding). Furthermore, an abuse of discretion does not occur as long as some evidence of substantive and probative character exists to support the trial court's decision. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002). A trial court has no discretion in determining what the law is or applying the law to the facts, even when the law is unsettled. *In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 135 (Tex. 2004).

In Dayna's sole issue on appeal, she argues that the trial court abused its discretion when it granted the grandparents access to J.P.C. because the

4

evidence was both legally and factually insufficient to support that decision. In appropriate cases, legal and factual sufficiency are relevant factors in assessing whether the trial court abused its discretion. *Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991); *Tex. Dep't of Health v. Buckner*, 950 S.W.2d 216, 218 (Tex. App.—Fort Worth 1997, no writ). Furthermore, when an abuse of discretion standard of review applies to a trial court's ruling, findings of fact and conclusions of law aid us in reviewing the propriety of the ruling by providing us with an explanation for the ruling. *Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 852 (Tex. 1992); *Samuelson v. United Healthcare of Tex., Inc.*, 79 S.W.3d 706, 710 (Tex. App.—Fort Worth 2002, no pet.).

## IV. Grandparents Access

A. Applicable Law

Section 153.433 of the Texas Family Code sets forth the requirements that must be met before a court may order grandparent access to a grandchild.[4] *See* TEX. FAM. CODE ANN. § 153.433.  The statute presumes that a parent acts in the child's best interest, and it permits a grandparent to obtain court-ordered

---

[4] The court shall order reasonable possession of or access to a grandchild by a grandparent if:

> . . . .

> (2) the grandparent requesting possession of or access to the child overcomes the presumption that a parent acts in the best interest of the parent's child by proving by a preponderance of the evidence that denial of possession of or access to the child would significantly impair the child's physical health or emotional well-being; and

> (3) the grandparent requesting possession of or access to the child is a parent of a parent of the child and that parent of the child:

>> (A) has been incarcerated in jail or prison during the three-month period preceding the filing of the petition;
>> (B) has been found by a court to be incompetent;
>> (C) is dead; or
>> (D) does not have actual or court-ordered possession of or access to the child.

TEX. FAM. CODE ANN. § 153.433(2)–(3).

access only upon a showing that denial of access will "significantly impair the child's physical health or emotional well-being." *In re Derzapf*, 219 S.W.3d 327, 333 (Tex. 2007) (orig. proceeding).

The Legislature has set a high threshold for a grandparent to overcome the presumption that a parent acts in his or her child's best interest: the grandparent must prove that denial of access would "*significantly* impair" the child's physical health or emotional well-being. TEX. FAM. CODE ANN. § 153.433(2) (emphasis added); *see Derzapf*, 219 S.W.3d at 334. This high threshold exists so that a court will refrain from interfering with child-rearing decisions made by a parent simply because the court believes that a "better decision" could have been made. *See Derzapf,* 219 S.W.3d at 334 (quoting *Troxel v. Granville*, 530 U.S. 57, 73, 120 S. Ct. 2054, 2064 (2000)).

B. Overcoming the Statutory Presumption

We must now determine whether the grandparents in this case presented sufficient evidence to overcome the presumption enunciated in section 153.433. To succeed on their claim, the grandparents had to prove by a preponderance of the evidence that the denial of access would "significantly impair" J.P.C.'s physical health or emotional well-being. *See Derzapf,* 219 S.W.3d at 334.

In an effort to demonstrate that the denial of access would significantly impair J.P.C., the grandparents urge us to consider their significant and lengthy past contact with J.P.C. that occurred in their home while they cared for Robert during the divorce proceedings. They argue that since their access to J.P.C. had been limited and restricted after Robert's death, J.P.C.'s behavior was "different" than it had been when they were able to see each other regularly—that J.P.C. was "longing." Maurine testified that when they were able to have a supervised visit at the park "[J.P.C.] would take me off and—just take me by the hand and want to go off and, you know, sit under the slide and just sit there and just be there. She just wanted to be with me." Richard testified that Dayna's supervision of their visits with J.P.C. "caused [J.P.C.] discomfort" and that J.P.C. acted differently, appearing inhibited, pensive, and superficial when Dayna was present.

The grandparents also argue that a clear visitation schedule was good for J.P.C. because it was not in J.P.C.'s best interest to have the constant pulling back and forth between themselves and Dayna as they tried to organize visitations. They express their fear that without a court order it would become almost impossible to establish regular visits, and as a result, J.P.C.'s memory of her father would dwindle and her father's side of the family would not be able to be a part of her life. They argue that their fear was evidenced by the

8

fact that J.P.C. threw pictures of her father into the trash. The grandparents also point to a letter that Dayna wrote to J.P.C.'s kindergarten teacher in which Dayna described Robert's illness and his "abnormal behaviors and verbal abusiveness" as an example of how Dayna was, according to the grandparents, "making every effort to control [J.P.C.'s] memor[y] of her father."

We have closely reviewed the record in this case for evidence that denial of access would significantly impair J.P.C.'s physical health or emotional well-being, and we are unpersuaded by the grandparents' arguments. Our review of the record shows that the grandparents have not presented any probative evidence to show that J.P.C.'s physical or emotional health would be significantly impaired by the denial of access. *See Butnaru*, 84 S.W.3d at 211. Instead, the grandparents have offered only bare, unsupported allegations that the denial of access would significantly impair J.P.C.

For instance, although they argue that limited and restricted access to J.P.C. was, in their opinion, causing her distress and causing her to act "different, inhibited, pensive, and superficial," the only evidence they offer to show that J.P.C. was distressed was Maurine's testimony regarding her interaction with J.P.C. at the park. However, they do not explain how J.P.C.'s alleged "discomfort" amounts to significant impairment, nor do they offer any evidence connecting J.P.C.'s "different, inhibited, pensive, and superficial"

9

behavior to the visitation schedule or Dayna's supervision of their visits. Instead, the "evidence" they raise is merely their own characterization of J.P.C.'s behavior, and their conclusion that such behavior was the result of the limited and restricted access.

Further, while the grandparents argue that without regular, court-ordered visits, J.P.C. would be significantly impaired because her memory of her father would dwindle, the grandparents have not presented any probative evidence to support their belief. For instance, although the grandparents rely on the fact that J.P.C. threw pictures of her father into the trash as evidence that J.P.C.'s memory of her father was dwindling, the record clearly shows that this event occurred during Dayna and Robert's divorce proceedings, while J.P.C. was regularly visiting their house during Robert's periods of visitation, and not subsequent to Robert's death. Thus, the grandparents' reliance on this piece of evidence is misplaced. Similarly, the grandparents' characterization of Dayna's letter to J.P.C.'s kindergarten teacher as evidence that Dayna was attempting to "control [J.P.C.'s] memor[y] of her father" is also unfounded. Rather, the record shows that the letter was Dayna's attempt to ease J.P.C.'s transition after the loss of her father by informing her teacher of the difficulties that J.P.C. had faced and issues that may arise as a result. Indeed, J.P.C.'s teacher testified that the letter Dayna gave her "was extremely helpful" in

10

letting her know what she might be dealing with in regards to J.P.C. Moreover, the grandparents have not presented any evidence showing that J.P.C. has been unable to remember her father. In contrast, the record shows that after Robert's death, J.P.C. had pictures of him in her room and that "she [would] have them up for a while. . . and then she [would] take them down."[5]

Furthermore, the grandparents' position that the denial of court-ordered visitation would significantly impair J.P.C. is based completely on their

---

[5] The testimony regarding J.P.C.'s interaction with her father's pictures after his death was confusing, at best.

Q: Can you tell the Court whether or not there are any photos of your deceased husband in your home?

A: Yes, there are.

Q: Are there any in your daughter's room?

A: Yes, there are.

Q: And what has she done with the photos in her room of her dad?

A: She would do different things at different times. During the divorce proceedings. . . . The photographs that had been in my room, she had put them away. Fortunately, fished some of them out of the trash can and take them and hide those.

Q: Since [Robert's] death, has there been any activity of your daughter with her dad's pictures?

A: Yes. There's still activity to where she'll have them up for a while. Then she'll take them down.

11

expressed feeling that it was not in J.P.C.'s best interest to have the constant pulling back and forth between themselves and Dayna, and their fear that without the court order it would become impossible to establish regular visits. However, there is no evidence that the schedule that existed before litigation, although not as frequent as the grandparents would have liked, was harming J.P.C.; again, this is just Maurine and Richard's opinion that regular, unsupervised visits would be better. With no other evidence to demonstrate how J.P.C. would be significantly impaired, these arguments, in and of themselves, are only reflections of the grandparents' fears and speculations and do not support the trial court's finding that the grandparents overcame the statutory presumption.

Significantly, the only testimony presented by the grandparents on the issue of whether J.P.C. was significantly impaired by the denial of access was their own testimony and the testimony of Karen, J.P.C.'s paternal aunt, who testified that if the grandparents were not given access, J.P.C. would have a lot of questions as to why. But "questions" are not evidence of significant impairment. Once again, other than their own opinions and that of an interested, nonexpert witness, the grandparents produced no evidence that J.P.C. would be significantly impaired in the absence of court-ordered access.

In contrast, Dayna presented evidence demonstrating that J.P.C. was not

12

significantly impaired by the denial of access. While the grandparents allege that the limited and restricted visits were causing J.P.C. distress, Dayna points out that both the grandfather and the paternal aunt actually testified that J.P.C. was a happy little girl. Similarly, J.P.C.'s kindergarten teacher testified that J.P.C. was a loving, sweet child who was very social and interactive with others. Moreover, Dayna points out that although the grandparents claim that the denial of visitation would significantly impair J.P.C., they actually made no effort to contact Dayna to set up a visitation schedule after Robert's death; instead, they immediately filed a petition for grandparent access. Lastly, Dayna argues that the imposition of visitation would serve only to make J.P.C. live under the constraint of a court order, an action that was unnecessary because Dayna was already offering the grandparents supervised visits with J.P.C.

After reviewing the record, we determine that the evidence produced by the grandparents, largely consisting of their own feelings and speculations, did not rise to the level of proving by a preponderance of the evidence that denial of access would significantly impair the physical health or emotional well-being of J.P.C. The mere opinion of the grandparents themselves and an interested, nonexpert witness that the grandparents should be granted access does not overcome the statutory presumption, nor does it support the court's

13

interference with Dayna's parental rights by awarding the grandparents court-ordered access to J.P.C.  Thus, the grandparents have failed to show that the denial of access would significantly impair J.P.C.'s physical or emotional well-being.  Because a trial court has no discretion in applying the law to the facts, the trial court's determination that the statutory presumption was overcome was an abuse of discretion.  *See In re Prudential Ins. Co. of Am.*, 148 S.W.3d at 135.

## V. Conclusion

Having determined that the grandparents failed to overcome the statutory presumption by proving by a preponderance of the evidence that the denial of access would significantly impair J.P.C.'s physical health or emotional well-being, we hold that the trial court abused its discretion in awarding the grandparents access to J.P.C.  Accordingly, we reverse the trial court's order and render judgment denying the grandparents' petition for access.


BOB MCCOY
JUSTICE


PANEL B:   LIVINGSTON, WALKER, and MCCOY, JJ.

WALKER, J. concurs without opinion.

14

DELIVERED: July 17, 2008