

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-10-00022-CV

_____

IN THE INTEREST OF B.G.M., A CHILD

On Appeal from the 115th Judicial District Court
Marion County, Texas
Trial Court No. 08-00106

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Carter

MEMORANDUM OPINION

Bud and Rhonda Marks, parents of B.G.M., appeal from a final order in a suit affecting the parent-child relationship brought by the Texas Department of Family and Protective Services (TDFPS). B.G.M.'s aunt, Sally Tarter, as well as B.G.M.'s sister, Tiffany Parsley, and her husband, John Parsley, intervened in the suit and sought conservatorship of the child. Trial to a jury resulted in a unanimous finding that possession of the child by her parents would significantly impair the child's physical health or emotional development and that Tarter should be appointed managing conservator of the child. The trial court's judgment appointed Tarter sole managing conservator of B.G.M.; listed Bud, Rhonda, and Tiffany as possessory conservators; gave only Rhonda limited telephone and therapeutic visitation rights; and ordered Bud and Rhonda to pay child support.

The Markses appeal the trial court's judgment alleging that the evidence is insufficient to rebut the presumption that it is in B.G.M.'s best interest to appoint them as joint managing conservators. They also complain that the trial court erred when it admitted a summary of an investigator's testimony and notes of his investigation over hearsay and bolstering objections. We affirm the judgment of the trial court.

I. **Sufficient Evidence Supported the Trial Court's Judgment**

A. **Standard of Review**

The best interest of the child is always the primary consideration in determining issues of conservatorship, access, and possession. TEX. FAM. CODE ANN. § 153.002 (West 2008); *In re M.T.C.*, 299 S.W.3d 474, 479 (Tex. App.—Texarkana 2009, no pet.). Because the trial court is in a position to analyze the facts with regard to issues of conservatorship, control, possession, child support, and visitation, the trial court is given "wide latitude in determining the best interests of a minor child." *Id.* (quoting *Stallworth v. Stallworth*, 201 S.W.3d 338, 347 (Tex. App.—Dallas 2006, no pet.); *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)). For that reason, a trial court's order regarding conservatorship is reviewed under an abuse of discretion standard. *Id.*; *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *Gillespie*, 644 S.W.2d at 451; *In re Marriage of Edwards*, 79 S.W.3d 88, 98 (Tex. App.—Texarkana 2002, no pet.). A trial court abuses its discretion only if it acts arbitrarily and unreasonably or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). A trial court does not abuse its discretion if some evidence of substantive and probative character exists to support the trial court's decision. *Id.*; *In re J.P.C.*, 261 S.W.3d 334, 336 (Tex. App.—Fort Worth 2008, no pet.).

Section 153.131 of the Texas Family Code creates a rebuttable presumption that the appointment of the parents as managing conservators is in the best interest of the child. TEX. FAM. CODE ANN. § 153.131(a) (West 2008); *M.T.C.*, 299 S.W.3d at 481. It provides:

> [U]nless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the

3

child's physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child.

TEX. FAM. CODE ANN. § 153.131(a).

The legal and factual sufficiency of the court's findings or implied findings may be challenged on appeal. *Agraz v. Carnley*, 143 S.W.3d 547, 554 (Tex. App.—Dallas 2004, no pet.). A finding that the appointment of a parent as managing conservator would significantly impair the child's physical health or emotional development is governed by a preponderance of the evidence standard. TEX. FAM. CODE ANN. § 105.005 (West 2008); *J.A.J.*, 243 S.W.3d at 616.

An adult's future conduct may be somewhat determined by recent past conduct; however, evidence of past misconduct, in and of itself, may not be sufficient to show present unfitness. *Whitworth v. Whitworth*, 222 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2007, no pet.). Specific acts or omissions of a parent implicating a significant impairment to a child's emotional development may be inferred from direct evidence. *Id.* However, this link between the parent's conduct and harm to the child may not be based on evidence that merely raises a surmise or speculation of possible harm. *Id.* "[I]n an original proceeding for a conservatorship determination, even 'evidence that the nonparent would be a better custodian' is insufficient to support the appointment of a nonparent as managing conservator in preference to a parent." *M.T.C.*, 299 S.W.3d at 481 (quoting *Lewelling v. Lewelling*, 796 S.W.2d 164, 167 (Tex. 1990)). "Rather, the nonparent is required to 'affirmatively prove by a preponderance of the evidence that

4

appointment of the parent as managing conservator would *significantly impair* the child, either physically or emotionally.'" *Id.* (quoting *Lewelling*, 796 S.W.2d at 167). A nonparent may overcome the presumption by producing evidence of "a history or pattern of past or present child neglect, or physical . . . abuse by [a] parent directed against the other parent, a spouse, or a child." TEX. FAM. CODE ANN. § 153.004(b) (West 2008).

### B. Factual Background

#### 1. B.G.M.'s Medical Condition and Treatment

Rhonda and Bud have been married for twenty-nine years. Their first daughter, Tiffany, is a twenty-five-year-old paralegal. Their second daughter, B.G.M., was born prematurely with cerebral palsy, a permanent, nonprogressive condition which results in tightness of the ligaments or tendons. Her cerebral palsy led to complications with her lower extremities, preventing her from walking normally. Because she was born to parents living below the poverty level, B.G.M.'s medical treatment was facilitated by her receipt of Medicaid. Her parents took her to Dr. Marc Edman Kimball in Marion County for regular treatment for several years. Dr. Kimball said B.G.M. was "well at that time other than her cerebral palsy." He emphasized that she "had a normal MRI of the head" and that nothing would prevent her from learning and growing emotionally and intellectually.

When B.G.M. turned four, her parents began reviewing her schooling options. They were afraid to place B.G.M. in regular school because she required constant supervision. Rhonda

testified that she called a local school to ask "[i]f there would be a lot of stairways for her to crawl up and down. She couldn't step up real high at the time . . . ." Rhonda was concerned that "the kids would make fun of her and laugh at her in school because she had a limp leg." Bud testified he also contacted a special educator who told him to work with B.G.M. at home until she was "physically able to enroll." Rhonda claimed she spoke with Dr. Kimball, who agreed that it would be all right to homeschool B.G.M. The decision was made that Bud would administer the homeschooling. A "MEDICAL RELEASE/PHYSICIAN'S STATEMENT" signed by Dr. Kimball stated that "father is caring for [B.G.M.] . . . home schooling her. She needs supervision." The Markses "went and got school disk[s] and stuff like that to work with her at home on the computer and books." Rhonda, however, was mentally deficient, had an eighth-grade education, and Bud only completed the tenth grade.

In 2006, when B.G.M. was approximately eight years old,[1] her parents moved to Lubbock, Texas, without their oldest daughter.[2] B.G.M. was not taken back to Marion County for treatment

---

[1] B.G.M. was born on February 2, 1998.

[2] Tiffany's relationship with her parents was strained. In 2003, when she was nineteen years old, Tiffany married a man her parents had never met. At the time of trial, Tiffany was twenty-five and her husband, John, was forty-two. The Markses attempted to talk her out of marrying John when she revealed her intention. Tiffany testified,

> When I moved out, I moved in with my best friend's mother. I stayed there for approximately two weeks. My father had my mother come to the house that I was staying at almost daily threatening me to the point that I got to where I just decided I was going to move in with John who is now my husband. My mother came to that house and practically kidnapped me. She convinced me to go to lunch with her. Instead of going to where we were going to lunch, she took me directly to their house. I walked into their house, and he assaulted me the second that I got into that house. He sat on top of me and he punched me in my face until I was black and blue, until there was blood in my eyes.

6

by Dr. Kimball after the move. Rhonda claimed that B.G.M.'s disability Medicaid terminated when they moved to Lubbock and that Dr. Kimball said "that she was not too bad, and if we needed anything to bring her back and if not, then she's okay." Dr. Kimball referred B.G.M. to a state and federally funded program called Early Childhood Intervention (ECI). Bud testified that he called ECI and "[a]ll they had to offer was physical therapy which we could do ourselves." Because he claimed, "I've been in physical therapy. I know how they do that. I know how to work muscles," he did not send B.G.M. to ECI. B.G.M. received no medical treatment while in Lubbock.

### 2. Child Protective Services (CPS) Investigation

In the summer of 2008, when Rhonda and Bud claimed to be living in Lubbock, they decided to return to Marion County to "fix up" a trailer owned by Rhonda's sister, Tarter, as a "summer home." Tarter warned the Markses that the trailer "was not liveable; but if they wanted to mess with it, they could." Rhonda testified that they repaired the "entire roof" so that it did not leak and that they replaced the living room floor. She claimed that the family stayed with her brother and next-door neighbor Donald Wayne while they were fixing the trailer and that B.G.M. had a bed in Wayne's home.

Tiffany was living in Marion County during this time and would visit during the weekends. In spending time with B.G.M., Tiffany became concerned that her father just "said that he was

---

A restraining order was filed against Bud, and Tiffany remained in Marion County after her family moved to Lubbock in 2006.

home schooling her" and was not providing adequate supervision. Tiffany claimed she was concerned about B.G.M.'s education because "[t]hey would come to my house and use my computer. They would leave her on the computer by herself to do this home schooling by herself." Tiffany also testified that the trailer had no electricity, holes in the ceiling, roaches, and that black mold was present. She called CPS to report her concerns. She added that her parents drank alcohol and smoked marihuana. Tarter also said she had seen the Markses smoking marihuana "maybe twice, three times" in "the last year or so."[3] Tiffany's prior experience with domestic abuse at the hands of her father, B.G.M.'s living conditions, suspected bug problem, lack of education, and an allegation that Bud suffered from psychosis was reported to CPS.[4]

Deputy Jimmy Simplier was sent to accompany CPS investigators to the first visit of the Markses' residence. Simplier met with Bud, who "got very irate" "[a]fter we identified ourselves." Simplier testified Bud "just said that [B.G.M.] was well taken care of," and

> was so upset because we were there, he told us that he had all of these attorneys if we wanted to talk to that we needed a warrant. We didn't have no right to be there that we had to have a warrant to be there. And he wants us to get off his place, off his property . . . . We could not explain anything to him. He was so out of control that we could not talk to him.

---

[3]The drug tests taken by the Markses in September and November of 2008 were negative.

[4]Tiffany's concern about the mental health of her father was prompted by an incident in which "he was talking about how everybody . . . around him was looking at him, staring at him, just utter paranoia. He at one point said that me and my husband had all these people watching him . . . . It was at that time, he got to the point it was just insane. I had to leave. He got -- he had this look in his eyes that he had whenever he was basically beating me when I was trying to move out. That scared me to the point that I had to leave. . . . I ran and he followed me."

8

Feeling threatened, Simplier did not ask permission to enter the home, but noticed that the trailer did not appear to have electricity because there was an extension cord which ran to another trailer home belonging to relative Aaron Estates.

After reporting Bud's demeanor during the first home visit, TDFPS special investigator Patrick Hill attempted a second home visit with CPS with court orders in hand. Bud met him outside of the trailer. Hill described his behavior: "He was very belligerent with us. He talked over me often. . . . Was just generally evasive and didn't cooperate a whole lot." In spite of this, Hill examined the single-wide two-bedroom trailer. Although Bud claimed that the Lubbock address on his driver's license was where they actually lived, B.G.M. had her own room containing personal effects "typical of a 10-year old." Hill testified,

> It had moderate clutter in certain areas, but . . . it didn't look very bad. There was some mold issues in certain places, some storage issues in other. There was minimal food, dry goods on hand, but the biggest thing that struck me, you know, was that it was just incredibly hot. It was the middle of June with no air conditioning in the residence.

The extension cord which was hooked up to Estates' trailer ran through the master bedroom window and plugged into a power strip to provide electricity to a coffee maker, box fan, television, and computer. There was no indication of bug or rat problems.

When interviewed, Bud was described as noncooperative, but Rhonda spoke with Hill. She said that "every now and then [Bud] gets a roofing job" and that she worked at a convenience

9

store.[5]  Although Hill found no evidence of drug use in the home, Rhonda's interview revealed drug use.  Hill stated,

> [W]hen I asked if she'd used any illegal drugs in a certain amount of time, she said that it had been seven months since she had smoked marijuana.  When I revisited the issued [sic] later in her interview, she recanted and said that if I was to give her an oral swab -- and I explained to her that an oral swab general [sic] gets about five to seven days worth of any illegal substance that might be in the system, she said that she would fail such a test and it would be positive for marijuana.

Next, B.G.M. was retrieved from her uncle Wayne's house.  She was thin, but not malnourished.  Hill observed that "she had a distinct limp/dragging of her left foot as she walked."  Rhonda told Hill that B.G.M. had not been to the doctor in four years.  B.G.M. "was dressed in typical 10-year old clothes that were moderately soiled, especially the pants."  Although there was running cold water in the trailer, Hill said, "[I]t seems like it had been a handful of days since either Mr. Marks, Mrs. Marks, or [B.G.M.] herself had bathed."  Hill noted B.G.M. "had acne and for a pre-pubescent I thought that was indicative of hygiene."

Rhonda claimed B.G.M. was homeschooled on the computer and had attained a fourth or fifth grade level of education, but admitted they did not "send the results of any test or any curriculum to any particular place to be certified."  Hill did not see any books in the home and decided to test B.G.M.'s knowledge.  B.G.M. could only recognize the word "I" from the written sentence "I like cats," and could not read any of the words in the sentence "Jack walks dogs."  B.G.M. could recite even numbers, but not odd numbers.  She could not spell her own first name

---

[5]Tiffany claimed that her father had never had a steady job.

10

and did not know her middle name. She knew the month, but not the year of her birth. Hill "asked her point blank if anyone told her what she ought to say to the CPS person, and she told [Hill] that her mother said make sure you say that you are home schooled and that you've been living with Edith," Rhonda's aunt.

As a result of the investigation, and even though Hill did not find there was evidence of danger to the child, B.G.M. was placed with Tarter pending further investigation.

### 3. Psychological Evaluations

The Markses were required to undergo psychiatric evaluations, counseling, parenting classes, and drug testing. They were allowed supervised visitation with B.G.M. Initially, Bud "cussed the secretary out and refused" to attend psychiatric evaluation. After the Markses spent time in jail for contempt of the court's orders in failing to comply with the service plan, they completed these requirements.

Psychologist Donald Eugene Winsted, III, examined the Markses and B.G.M. Winsted noticed that Bud appeared to be giving socially desirable responses, a mechanism which Winsted called "faking good." Bud denied having common feelings such as anger, jealousy, and envy, and said he was unaffected by criticism, disapproval, reassurance, and praise. Due to his defensiveness, Winsted was unable to form a definite opinion about the allegation of psychosis, although Bud did not appear agitated or paranoid during the interview. Winsted described Bud's cognitive functioning in "the low end of the average range."

11

Winsted's evaluation of Rhonda revealed a full scale I.Q. of 62, within the mentally deficient range. Winsted testified that although Rhonda was "faking good," she "reported having significant problems in her family" and told him she "has experienced a lot of fights in her family." He opined that "[r]elationships with family members are likely to be high[ly] conflictual and possibly violent." He also found that Rhonda "appears to not understand or value [children's] normal developmental needs" and concluded "[t]hat is she is likely to perceive a child's normal developmental needs as bothersome and annoying. . . . [because] her nurturing skills are lacking." Since Winsted felt Rhonda "is likely to value her own needs over that of her children's needs and only value her children when they are meeting her needs," he concluded that she could "become easily stressed with the routine tasks of parenting."

Winsted's evaluation of B.G.M. resulted in a finding that although "her verbal intelligence was 92," and was within the normal range between 85 and 115, "her nonverbal was 57," "her reading was 61, spelling was 65, and her arithmetic was 60." During the interview, B.G.M. stated that she felt she had been neglected and that she worried a lot. Tarter testified B.G.M. had confided that she was abandoned with different people from time to time and that she was scared when she witnessed her parents fighting.

B.G.M. also underwent diagnostic testing with Sally Evera Tellberg of Gregg County Special Education Services to assess her educational achievements. Tellberg testified B.G.M. was reading at a first grade level. Tellberg found that while B.G.M.'s verbal intelligence,

nonverbal intelligence, composite intelligence, and composite memory were below average, her scores did not qualify her for special education. The decision was made that B.G.M. would be placed in main stream education with special educational services in the upcoming school year. Contrary to the Markses' contention that B.G.M. was dyslexic, Tellberg did not find evidence of any learning disability. B.G.M. began school in the fall.

*4. B.G.M.'s Counseling*

Joann Christian met with B.G.M. "mostly every week" for counseling. Initially, B.G.M. was "very timid; very shy; very, very withdrawn," had self-esteem issues, and appeared immature for her age. According to Christian, "[h]er vocabulary was . . . not as extensive as it should have been." After one month of building rapport with B.G.M., Christian asked B.G.M. about her parents, but "the very moment that [Christian] mentioned her parents, she burst into tears and sobbed hysterically." Christian testified,

> She had tremendous sadness that she was experiencing and fears that she had. . . . And she said that I don't want to see my parents. I don't want to talk to my parents. I don't want to be with my parents. She was just completely adamant at that time. . . . She was so upset that she took her hands and she put them over her face and buried her face in her lap and shook as she sobbed and sobbed and sobbed. . . . I'm thinking this child has some significant and severe trauma that has occurred to her that would cause her to have such strong feelings about her parents.

Recounting another counseling session, Christian stated B.G.M.

> brought up the fact that she'd had to come to court that day. That she got to sit in the judge's office, she called it. . . . . And then all of a sudden, she just became very emotional and she started crying. And at that point, she said that she was scared of her father, and she didn't want to be around him. . . . What she told me

13

at that time is that she remembered how her father would beat Tiffany, and she's afraid of him. . . . Later on she stated that her parents were trying to get her to go back to live with them by telling her that they would take her places and do things for her. She stated over and over again during that session that she wanted to stay with her Aunt Sally.

Christian further testified,

[I]n [B.G.M.'s] verbalization, she had said that her mom and dad used lots of drugs. She stated that she had moved between East Texas and Lubbock several times. She described living in a house with no electricity, that was down in the woods. She stated that she had to play outside and make mud figures and she started talking again about the volcanoes that she would make. She stated that she was sometimes locked out of the house when her parents fought.

B.G.M. told Christian "that she had never had friends over to play before" and recounted an incident "where she poured cereal out of a box, and she had to pick roaches out of it before she could eat it." Tarter also testified that B.G.M. "slept with her head covered up," a habit which B.G.M. said she developed "to keep the roaches and rats from getting on her."

Since B.G.M.'s placement with Tarter, Christian testified she "had made such great emotional changes and development." B.G.M. "loves school and those activities are very, very important to her, especially since this has been the first experience she's had with school." B.G.M. had said "Aunt Sally and Tiffany are taking care of me, and they're keeping me safe. And John and Uncle Tarter are keeping my daddy away from me." Christian claimed that B.G.M. "did not want to see her father at all. . . . She was very upset that she had been order[ed] to call them each week. . . . She didn't want to talk to her father, but she did want to talk to her mother."

### 5. Visitation

14

Supervised visitation began to raise concerns among the social workers. The first set of visits occurred in Tarter's home. CASA employee Shameka Provost noted that B.G.M. "had been in the home for approximately one week and she did not know how to bathe herself." B.G.M. could not read even "simple readers" or "primers." Provost claimed B.G.M. "would shut down and change the subject every time whenever we talked about her living arrangement and conditions before having come into care." Nevertheless, the Markses' visits with B.G.M. were appropriate, and B.G.M. was happy to see her parents. Tarter testified that she had even expressed a desire to go home and live with her parents. However, the Markses began arriving for visitation after B.G.M.'s bed time, and Tarter asked that the visitation occur elsewhere.

At this time, the Markses continually maintained that they had a residence in Lubbock. Provost obtained the address of the Markses' residence from their attorney and contacted CASA worker Dawn Riley in Lubbock to investigate. "Dawn found that the property was owned by Mr. Marks's first cousin, Glen McDonald and Mr. McDonald when she entered the property, that he was very hostile towards her." Riley was instructed to leave, and McDonald followed her down the overgrown driveway of the trailer. Riley said the "trailer didn't look safe, and [was] in various stages of disrepair." Further investigation revealed that McDonald "had an open CPS case there himself."

Visitation was next scheduled at a local Dairy Queen. Provost was concerned that Bud "spent time playing with her, but he spent a large portion of that visitation talking to me and talking

at me, berating me." She described Bud as "caustic," "belligerent," and evasive. When questioned about her academic ability, Bud told Provost that B.G.M. was dyslexic. Provost included this claim in her written report, along with a notation that B.G.M. had not been tested for dyslexia.

At the second visitation, Provost said she was "met with a very unpleasant surprise from Mr. Marks," in which he "was extremely hostile and rude." Provost encouraged Bud to play with B.G.M., but he did not take the suggestion. Provost claimed that while he was berating her, Bud would tell B.G.M. that he loved her, that Provost was not her friend, and that Provost did not want her to come home. Provost testified, "It made me extremely uncomfortable. Mr. Marks had a quality in which it was very frightening. . . . The look in his eye was frightening to me. He was, I felt, on the verge of losing control." After consulting with her program manager, the police were called so that they could provide an escort to B.G.M. and Tarter as they drove home.

At some point in the case, the Markses moved back to Lubbock. After their move, Tiffany and Tarter went to inspect the trailer which the Markses had left behind to obtain a better understanding of B.G.M.'s living conditions. Tiffany claimed that the trailer had holes in the floor, walls, and ceiling; that the bathroom ceiling "was covered with mold to the point that it looked like the ceiling was painted black"; that "rat droppings [were] everywhere"; and that "[i]n every part of the house there were roaches crawling." Tarter also said "[t]here's still holes in that trailer. There is rats in that trailer, and there is roaches in that trailer."

16

*6.     B.G.M.'s Wishes and the Recommendations*

Caseworker Sarah Biddy testified that B.G.M. wanted to "stay with Aunt Sally. That is something that she had been adamant with me about." Tarter claimed B.G.M. was "terrified of having to go back with [her parents]." Tiffany and Provost testified that B.G.M. indicated she would run away if she was forced to live with them again. B.G.M.'s counselor Christian reported to the jury that B.G.M. should not be returned to her parents because she fears her father.

Christian opined that living with the Markses "would be devastating to her," and "would impair her emotional development now and in the future." Christian explained, "[W]hen you take all of those things, going to school for the first time, having friends, that's a part of a child's normal socialization not only academic development, but their emotional development." Provost believed that toward the conclusion of the case, B.G.M. became "mad that she had been living the way that she was. And having lived in a different way and probably in better condition highlighted for her that she was not living in a safe environment prior to coming into care." Provost testified the Markses' insistence that B.G.M. was dyslexic was also damaging; she testified, "One of the things that she said to me is that now, that I'm in school, I realize that I'm not dumb." Provost told the jury that going back to her parents would impair B.G.M.'s emotional, social, and even physical development considering that the Markses had not taken advantage of free services to obtain proper medical care.

17

Despite the fact that she had intervened in the suit and sought conservatorship of B.G.M., Tiffany testified, "I feel that Aunt Sally has provided her with a safe home as much as what I would have done too. The school district that she is in is more equipped and prepared for [B.G.M.] in the educational needs that she needs versus the school district that I'm in." Tiffany said that B.G.M. is happy with Tarter and that it was in her best interest to remain with her.

**C.      The Section 153.131 Presumption Was Rebutted**

Again, the trial court is afforded broad discretion in deciding the conservatorship of a child. *Gillespie*, 644 S.W.2d 451. Our review of this evidence leads us to conclude that appointment of B.G.M.'s parents as managing conservators was not in B.G.M.'s best interest. We find that TDFPS proved that such appointment would significantly impair B.G.M.'s physical health or emotional development by a preponderance of the evidence.

*1.      Physical Health*

With respect to B.G.M.'s physical health, the record shows that despite B.G.M.'s diagnosis of cerebral palsy, and recommendation and referral by Dr. Kimball that she attend physical therapy, B.G.M. received no medical care for several years while living with her parents in Lubbock. Instead of taking advantage of free physical therapy through ECI, Bud decided he was qualified to administer the therapy on his own. When Hill saw B.G.M., she "had a distinct limp/dragging of her left foot as she walked." Since her placement with Tarter, Kimball testified

18

B.G.M. was given braces and was "walking better, and by my last report, she was actually able to run a little bit."[6]

Dr. Kimball testified that living in unsanitary conditions could affect B.G.M.'s physical health. Testimony from witnesses, though contested, was sufficient for a rational fact-finder to believe that the trailer was infested with roaches and rats. Hill testified B.G.M. bathed about once a week despite the hot June weather and lack of air conditioning. According to Provost, she was unable to bathe herself when she was first removed from the home. Hill believed B.G.M.'s acne, which cleared after placement, was due to a lack of hygiene.

Hill said that the trailer contained food. While B.G.M. was not described as malnourished, she was "very tiny, very small." She went from a size "5/6" to a size "16/18" during the case. Christian testified B.G.M. was happy to have food. Tarter said, "[W]hen she eats, she acts like she's never eaten, but I know that she has. But she just eats like over and over."

The combination of the facts above was sufficient for a rational fact-finder to conclude that B.G.M.'s return to her parents would significantly impair her physical health.

### 2. *Emotional Development*

The evidence of significant impairment of emotional development was more noteworthy. Bud was allegedly homeschooling B.G.M. on the computer. It is undisputed that no results of any

---

[6]Kimball testified that there were no signs that B.G.M. failed to receive medical care during the gap in treatment. He was also uncertain whether having braces earlier would have helped. Rhonda testified that she would take B.G.M. to the doctor as often as recommended if she was returned. However, we cannot say that the trial court abused its discretion in finding B.G.M.'s return to her parents would significantly impair her physical health considering the Markses' history of medical neglect and philosophy about necessary medical treatment.

19

homeschooling activities were sent for credentialing. When asked why B.G.M.'s level of academic achievement was that of "maybe a kindergartner" for a ten-year-old child, Bud and Rhonda insisted it was because B.G.M. was dyslexic, even though she had never been tested.

After her placement, testing revealed that B.G.M. had no learning disabilities. After her first year of school while in Tarter's care, B.G.M. was tested on the fourth grade level and "met the State's standard for math." While she still needed special assistance with reading and writing, B.G.M. was promoted to the fifth grade. April Hayes, a CPS Advance Specialist IV, testified that even if her parents decided not to enroll B.G.M. in public school, they could have enrolled her in a head start program designed for disabled children and children coming from low-income families. This constituted evidence that B.G.M.'s educational needs were not being met.[7]

As a reviewing court, we may consider concepts of psychological parenting, bonding, and the depth of attachments to parental figures in the context of the evidence presented. *See In re De La Pena*, 999 S.W.2d 521, 529 (Tex. App.—El Paso 1999, no pet.). B.G.M. had told her counselor that she was left with different people from time to time, felt abandoned sometimes, and that she would be locked out of her home on occasion when her parents fought. Winsted said Rhonda's nurturing skills were lacking, that she would perceive normal development needs as bothersome and annoying, and that she could become easily stressed with the routine task of parenting. Bud's psychological evaluation was inconclusive as he was defensive and denied

---

[7]During trial, Rhonda testified that B.G.M. could go to a different public school in the district where the Markses currently resided, although B.G.M. expressed resistance to moving.

feeling common emotions. Yet, Tiffany described him as psychotic, and caseworkers and officers consistently referred to him as belligerent. He cursed at caseworkers, threatened them, and neither parent completed services ordered by the court until after being thrown in jail for contempt. Most telling was B.G.M.'s repeated statements to Tarter, Tiffany, caseworkers, and counselors that she was afraid of her father and that she did not want to live with her parents.

We recognize that safety, security, and stability are factors critical to child welfare, and depending on the circumstances of each case, the danger from uprooting a child may rise to the level of significantly impairing the child's emotional development. *Id.* Significant impairment has been inferred from uprooting a child from a nonparental caretaker when the removal would be "devastating" or akin to "psychological amputation" or cause "serious psychological damage." *See In re J.C.*, No. 14-10-00262-CV, 2011 WL 2802927, at *4 (Tex. App.—Houston [14th Dist.] July 19, 2011, no pet. h.) (quoting *In re Rodriguez*, 940 S.W.2d 265, 273 (Tex. App.—San Antonio 1997, writ denied)). B.G.M. had stated to Christian and Provost that she did not feel that she was safe in her previous living conditions, that "Aunt Sally and Tiffany are . . . keeping me safe," and that their husbands were "keeping my daddy away from me." Also, Christian, Provost, Tiffany, and Biddy all testified that B.G.M. wanted to remain with Tarter and that it was in her best interest to do so. Christian testified B.G.M. "had made such great emotional changes and development [that] removing her from that would be devastating to her."

21

We find the evidence presented sufficiently demonstrated that appointing Rhonda and/or Bud managing conservator(s) was not in B.G.M.'s best interest because such appointment would significantly impair B.G.M.'s physical health or emotional development.   Therefore, we overrule the Markses' first point of error.

## II.      Admission of Hill's Affidavit and the Contact Log Narrative

A trial court's decision to admit or exclude evidence is reviewed for abuse of discretion. *Good v. Baker*, 339 S.W.3d 260, 270 (Tex. App.—Texarkana 2011, no pet.) (citing *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001)).   During Hill's direct testimony, TDFPS sought the admission of his affidavit which was attached to their "PETITION FOR ORDERS IN AID OF INVESTIGATION OF A REPORT OF CHILD ABUSE."   They also sought admission of Hill's "Contact Log Narrative" containing Hill's observations and notes during the investigation.   The trial court admitted these documents as a summary of Hill's testimony subject to cross-examination.

Our review of these documents and the record leads us to conclude that neither of these documents can be considered as a summary of Hill's testimony.   Prior to admission of the affidavit, there had been no testimony of the following damaging statements contained within:

> Marks . . . is alleged to have "mental problems" possibly including psychosis. Mr. Marks is alleged to be "very paranoid" and" [sic] gets "agitated to an extreme.". . .   Mr. Marks is described as "very controlling" in the report.   . . . There are allegations of past domestic violence in the home between Mr. Marks and his wife, Rhonda Marks.  . . .   The . . . family has a history of mental disorders including a sister who is a paranoid schizophrenic and a mother who may also be a

22

paranoid schizophrenic. The reporter said that Mr. Marks has had guns in the home in the past. . . . Mr. Marks is a violent person and that CPS employees should probably take law enforcement with them when they go to the residence. . . . Mr. Marks is very paranoid and that he thinks that "people are staring at him." . . . . Ms. Parsley stated that Mr. Marks has threatened to relocate with [B.G.M.] but she believes he lacks the funds to do so.

Further, it was readily apparent from the affidavit that Hill did not have personal knowledge of the facts included therein. We find Hill's affidavit constituted hearsay, was not subject to any hearsay exception, and that its admission was erroneous.[8]

TDFPS offered the contact log narrative as a business record, laying the proper predicate required. Additionally, the contact log narrative appears to be a public record and report under Rule 803(8) of the Texas Rules of Evidence. Under this Rule, "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies setting forth: . . . (B) matters observed pursuant to a duty imposed by law . . . or (C) in civil cases as to any party . . . , factual findings resulting from an investigation made pursuant to authority granted by law" do not constitute hearsay unless they indicate a lack of trustworthiness. TEX. R. EVID. 803(8)(C). The contact log narrative appears to track Hill's observations made during the investigation. Therefore, we cannot conclude that the trial court abused its discretion in admitting the contact log narrative.

To obtain reversal for any error arising from the admission of Hill's affidavit, the Markses must show that the error probably resulted in an improper judgment. *Good*, 339 S.W.3d at 273

---

[8]Our review of TDFPS's briefing reveals that it focused on whether any error caused harm instead of addressing whether the admission of these documents was erroneous.

(citing *Interstate Northborough P'ship*, 66 S.W.3d at 220). We review the entire record in making this determination. *Id.* (citing *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004)). The complaining party must generally demonstrate that the "judgment turns on the particular evidence admitted." *Id.* The evidence detailed in our opinion above was not derived from the affidavit. Rather, in looking at the testimony of Hill (and making sure to exclude responses to his cross-examination regarding the affidavit conducted after its admission), and other witnesses in the case, we concluded the evidence was sufficient to support the trial court's judgment. Therefore, we cannot say that admission of Hill's affidavit was reasonably calculated to cause and probably did cause rendition of an improper judgment in the case.

## III.    Conclusion

We affirm the trial court's judgment.

Jack Carter
Justice

Date Submitted:    July 26, 2011
Date Decided:    August 4, 2011