ACCEPTED
06-14-00071-CV
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
1/7/2015 2:57:04 PM
DEBBIE AUTREY
CLERK

## NO. 06-14-00071-CV

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS

1/9/2015 4:02:00 PM

DEBBIE AUTREY
Clerk

IN THE

SIXTH COURT OF APPEALS

AT TEXARKANA, TEXAS

### IN THE INTEREST OF A.B.O. AND E.B.O., CHILDREN

APPEAL FROM
THE COUNTY COURT AT LAW OF LAMAR COUNTY, TEXAS

## APPELLANT'S BRIEF

Brent M. Langdon
TX State Bar No. 11902250
blangdon@ldatty.com
Lisa McPherson
TX State Bar No. 24062883
lisam@ldatty.com

LANGDON✴DAVIS, L.L.P.
5902 Summerfield, Ste. A
P.O. Box 5547
Texarkana, Texas 75503
Phone (903) 223-3246
Fax (903) 223-5227
*Attorneys for Appellant, David O'Dell*

Pursuant to Rule 38.1(a) of the Texas Rules of Appellate Procedure, Appellant lists below the names all parties to the trial court's final judgment or order appealed from together with the names and addresses of all trial and appellate counsel.

*Parties:*

- David Brian O'Dell, Respondent/Counterpetitioner/Appellant

- Melanie McMurtry, Petitioner/Counterrespondent/Appellee

*Trial and Appellate Counsel:*

| | |
|---|---|
| Chad Cable<br>Chad Cable Law Offices<br>323 Gilmer St.<br>Sulphur Springs, TX 75482<br>*Trial Counsel for*<br>*Melanie McMurtry* | Brent M. Langdon<br>Langdon✻Davis, LLP<br>5902 Summerfield, Ste. A<br>Texarkana, TX 75503<br>*Trial and Appellate Counsel for*<br>*David Brian O'Dell* |
| John R. Mercy<br>Mercy✻Carter✻Tidwell, LLP<br>1724 Galleria Oaks Dr.<br>Texarkana, TX 75503<br>*Appellate Counsel for*<br>*Melanie McMurtry* | Lisa McPherson<br>Langdon✻Davis, LLP<br>5902 Summerfield, Ste. A<br>Texarkana, TX 75503<br>*Appellate Counsel for*<br>*David Brian O'Dell* |

# TABLE OF CONTENTS

Identity of Parties and Counsel ................................................................... ii

Table of Contents ..................................................................................... iii

Index of Authorities ....................................................................................v

Statement of the Case ..................................................................................2

Issues Presented .........................................................................................8

Statement of Facts .....................................................................................11

Summary of the Argument...........................................................................18

Argument and Authorities...........................................................................20

Standard of Review ....................................................................................20

      **ISSUE ONE**: ...................................................................23

      **ISSUE TWO:** ..................................................................27

      **ISSUE THREE:** ...............................................................30

      **ISSUE FOUR:** .................................................................37

      **ISSUE FIVE:** ..................................................................37

      **ISSUE SIX:** ....................................................................37

      **ISSUE SEVEN:** ...............................................................37

      **ISSUE EIGHT:** ................................................................40

      **ISSUE NINE:** ..................................................................56

Conclusion & Prayer ..................................................................57

Certificate of Service ................................................................61

Electronic Compliance................................................................62

Certificate of Compliance .........................................................62

# INDEX OF AUTHORITIES

**CASES:**                                                     **PAGE**

*Brigham v. Brigham*,
863 S.W.2d 761, 762 (Tex. App. – Dallas 1993, *no writ*)................................................21

*Chavez v. Chavez*,
148 S.W.3d 449, 457 (Tex. App. – el Paso 2004, *no pet.*)........................................20, 25

*Downer v. Aquamarine Operators, Inc.*,
701 S.W.2d 238 (Tex. Sup. 1985), cert. denied, 476 U.S. 1159 (1986).......................20

*Holley v. Adams*,
544 S.W.2d 367, 371-72 (Tex. 1976).............................................................................38

*In re A.N.G.*,
No. 02-09-006-CV (Tex.App. – Fort Worth 2010, no pet.)
(memo op,; 1-21-10)......................................................................................................47

*In re Chambless*,
257 S.W.3d 698 (Tex. 2008) (per curiam)................................................................31, 32

*In re Derzapf,*
219 S.W.3d 327, 333 (Tex. 2007)..................................................................................26

*In re Herd*,
537 S.W.2d 950, 952 (Tex.App. – Amarillo 1976, writ ref'd n.r.e.)...........................22

*In re J.M.T.*,
280 S.W.3d 490, 493 (Tex. App. – Eastland 2009, no pet.) ......................33, 34, 51, 52

*In re J.P.C.*,
261 S.W.3d 334,339-40 (Tex. App. – Fort Worth, no pet.)............26, 30, 31, 47, 51, 56

*In re King's Estate*,
150 Tex. 662, 244 S.W.2d 660 (1951)...........................................................................56

*In re Mays-Hooper*,
189 S.W.3d 777, 778 (Tex. 2006) (per curiam).............................................................26

*In re Pensom*,
126 S.W.3d 251, 254 (Tex.App. – San Antonio 2003, orig. proceeding)..........23, 24

*In re Russell,*
321 S.W.3d 846, 856-7 (Tex.App. – Forth Worth 2010, no pet.) ...............................23

*In re S.W.H.*,
72 S.W.3d 772, 776 (Tex. App. – Fort Worth 2002, *no pet.*)................................20, 21

*In re Scheller*,
325 S.W.3d 640 (Tex. 2010) ................................................................................23, 47

*In re Sullender*,
No. 12-12-00058-CV (Tex. App. – Tyler 2012, orig. proceeding) .............................46
(memo op; 7-11-12)

*Southwestern Bell Telephone Co. v. Garza,*
164 S.W.3d 607, 622 (Tex. 2004).............................................................................23

*Svoboda v. Svoboda*,
NO. 03-09-00189-CV (Tex.App.-Austin, 2009) ....................................................26, 27, 29

*Troxel v. Granville*,
530 U.S. 57, 66, 68 (2000).........................................................................23, 25, 34, 52

**STATUTES AND RULES:**

Tex. Fam. Code § 102.004...............................................................................18, 28, 47, 48
Tex. Fam. Code § 102.003............................................................................................ 18, 28
Tex. Fam. Code § 151.131............................................................................................24
Tex. Fam. Code § 153.002............................................................................................30, 38
Tex. Fam. Code § 153.004............................................................................................25
Tex. Fam. Code § 153.432............................................................................................46
Tex. Fam. Code § 153.433...............................19, 25, 26, 29, 30, 31, 33, 34, 38, 46, 47, 51, 52
Tex. R. App. Proc. § 43.2............................................................................................19

NO. 06-14-00071-CV

IN THE

SIXTH COURT OF APPEALS

AT TEXARKANA, TEXAS

IN THE INTEREST OF A.B.O. AND E.B.O., CHILDREN

APPEAL FROM
THE COUNTY COURT AT LAW OF LAMAR COUNTY, TEXAS

APPELLANT'S BRIEF

IN THE COURT OF APPEALS FOR THE
SIXTH DISTRICT OF TEXAS
AT TEXARKANA, TEXAS

**IN THE INTEREST OF A.B.O. AND E.B.O., CHILDREN**

**BRIEF OF APPELLANT**

TO THE HONORABLE COURT OF APPEALS:

COMES NOW Appellant, David Brian O'Dell, and files this brief on appeal from the trial court's Final Judgment dated May 30, 2014, requesting that this Court reverse the Judgment of the Lamar County Court at Law and would show unto the Court as follows:

**STATEMENT OF THE CASE**

*Nature of the Case*

This is an appeal by the father of the children from the appointment of the maternal grandmother as joint managing conservator with the right to designate the primary residence of the children.

*Trial Court*

The Honorable Bill Harris, County Court at Law, Lamar County, Texas

*Trial*

Non-jury trial

*Course of the Proceedings*

Appellant, David Brian O'Dell,[1] and Alisa Jene O'Dell[2] were divorced pursuant to a Final Decree of Divorce filed of record on August 19, 2004. CR 5.[3] The decree designated both parents as joint managing conservators of the two children born of the marriage, A.B.O. and E.B.O., with Jene granted the exclusive right to designate the primary residence of the children and O'Dell ordered to pay child support. CR 2, 11.

On December 3, 2012, Appellee, Melanie McMurtry,[4] the maternal grandmother of the children filed a Petition in Intervention in Suit Affecting the Parent-Child Relationship, seeking sole managing conservatorship of the children and requesting temporary orders, child support, and visitation for O'Dell and Jene. CR 51. In her petition, McMurtry alleged that continued appointment of the parents as joint managing conservators would not be in the best interest of the children because the appointment would significantly impair the children's physical health or emotional development. CR 52. There was no required affidavit filed with the petition setting forth any facts in support of the requested relief, merely a verification

---

1 "O'Dell" or "Appellant".
2 "Jene".
3 *Preparer's Note: The Clerk's Record will be cited as CR; and, the Reporter's Record will be cited as RR; Exhibits will be cited as Exh.
4 "McMurtry" or "Appellee".

3

of the statements in the petition as being within McMurtry's personal knowledge and true and correct. CR 54. Even the pleading itself was devoid of any actual or alleged facts on which to base standing, modification, or any other relief sought. The petition simply stated that appointment of the parents as joint managing conservators would not be in the children's best interest because it would impair their physical health and emotional development. CR 52.

In response, on December 17, 2014, O'Dell filed a Motion to Deny Relief in Petition in Intervention in Suit Affecting the Parent-Child Relationship. CR 62. Simultaneously, O'Dell filed an Original Answer to McMurtry's petition for intervention, requesting it be denied. CR 60. In his motion to deny the intervention, O'Dell effectively cited his objection to the intervention by calling attention to McMurtry's status as a non-parent. CR 62. Furthermore, he called the court's attention to the glaring lack of adequate facts shown by McMurtry in her petition on which to support the relief sought including as follows: (1) no facts to support her appointment as a non-parent conservator based on impairment of the physical health and/or emotional development of the children if O'Dell was appointed as the conservator with the right to designate the residence of the children; (2) no facts to support her request to designate the primary residence of the children based on consent of the parent with the exclusive right to make such designation or that

4

modification is in the best interest of the children; and, (3) no facts to support her allegation that the parent with the right to designate the children's primary residence has voluntarily relinquished the primary care and possession of the children to her for at least six months and that it is in the best interest of the children. CR 62-63. Likewise, O'Dell filed a Counterpetition to Modify Parent-Child Relationship with a request for Temporary Orders on December 17, 2012, requesting that he be appointed the conservator with the right to designate the primary residence of the children, that Jene's visitation be supervised, and that she be ordered to pay child support. CR 55.

Based on O'Dell's application and request for temporary orders, the trial court issued a mutual temporary restraining order filed of record on December 17, 2012. CR 64. On January 10, 2013, the trial court heard McMurtry's Motion for Temporary Orders after which the court entered orders on March 5, 2013, appointing McMurtry and O'Dell as Joint Temporary Managing Conservators and Jene as Temporary Possessory Conservator of the children. CR 81. The court also temporarily designated McMurtry as the conservator with the exclusive right to designate the primary residence of the children. CR 81. The court also entered orders entitling McMurtry to possession of the children at times previously ordered for Jene, possession and access orders for Jene to be supervised by McMurtry, orders

5

for mediation of the case, and court ordered counseling for the children. CR 81.

*Trial Court's Disposition of the Case*

A final hearing was held on April 10, 2014, after which the judge interviewed the children in chambers with a court reporter present. RR 339-423. The trial court issued a letter ruling on April 21, 2014, granting McMurtry's Motion to Modify and Petition for Intervention in SAPCR. CR 114. The trial court then signed a Final Order in Suit Affecting the Parent Child Relationship on May 30, 2014, appointing McMurtry and O'Dell as Joint Managing Conservators and designating McMurtry as the conservator with the right to designate the primary residence of the children in Lamar County. CR 116. The court appointed Jene as Possessory Conservator of the children as supervised by McMurtry and ordered O'Dell to pay child support. CR 116.

*Post-Trial*

Following entry of the final order, O'Dell filed his first Findings of Fact and Conclusions of Law on June 12, 2014. CR 150. O'Dell then filed Proposed Findings of Fact and Conclusions of Law on June 30, 2014, as requested by the trial court. CR 152. Thereafter, O'Dell filed his Notice of Past Due Findings of Fact and Conclusions of Law on July 14, 2014. CR 156. The trial court entered Findings of Fact and Conclusions of Law on July 24, 2014. CR 159. O'Dell filed a Request for

6

Additional and Amended Findings of Fact and Conclusions of Law on August 4, 2014. CR 162.  O'Dell filed his Notice of Appeal on August 18, 2104. CR 165. The trial court entered an order granting O'Dell's request for the same September 8, 2014. CR 169.

## ISSUES PRESENTED

### ISSUE #1

The trial court's application of the modification and conservatorship statutes in this matter violated O'Dell's constitutional rights as a parent of the children.

### ISSUE #2

The trial court erred as a matter of law, concluding that McMurtry had standing to sustain her intervention and obtain modification of the prior order.

### ISSUE #3

The trial court erred as a matter of law, concluding that McMurtry has overcome the presumption that a parent acts in the best interest of the children by proving that the denial of possession of or access to the children would significantly impair the children's health and emotional well-being.

### ISSUE #4

The trial court erred as a matter of law, concluding that appointment of O'Dell as sole managing conservator or continuing to have both parents as joint managing conservators would significantly impair the children's physical health or emotional development.

### ISSUE #5

The trial court erred as a matter of law, concluding that naming McMurtry as a joint managing conservator of the children is in the best interest of the children.[5]

---

5 This Conclusion was amended from the Trial Court's original #4 pursuant to the Amended Findings of Fact and Conclusions of Law. CR 169.

**ISSUE #6**

The trial court erred as a matter of law, concluding that naming McMurtry as the conservator with the exclusive right to designate the primary residence of the children is in the best interest of the children.[6]

**ISSUE #7**

The trial court erred as a matter of law, concluding that modification of the prior order establishing conservatorship and possession or access to the children is in the best interest of the children.

**ISSUE #8**

There is no legally of factually sufficient evidence to support the following trial court's findings of fact:

Finding 2.  That McMurtry had actual exclusive care, control and possession of the subject children for more than six months prior to filing her intervention.

Finding 2.  That McMurtry has effectively been the primary caretaker of the subject children for most of their lives.[7]

Finding 4.  That the subject children have little bond with their father, O'Dell.

Finding 5.  That McMurtry executed and attached an affidavit on knowledge and belief that contained, along with supporting facts, the allegation that denial of possession of or access to the children would significantly impair the children's physical health or emotional well-being.[8]

---

6 The Trial Court's Findings of Fact and Conclusions of Law included a duplicate provision numbered as both paragraphs "4" and "5" under the Conclusions of Law section. CR 161.

7 The Trial Court's Findings of Fact and Conclusions of Law contained two paragraphs numbered as "2". CR 159-60.

8 The Trial Court's Findings of Fact and Conclusions of Law contained two paragraphs numbered as "5". CR 159

**Finding 6.** That the facts stated in the affidavit were true and were sufficient to support the relief requested.

**Finding 7.** That naming O'Dell as the conservator with the exclusive right to determine the primary residence of the subject children would significantly impair the children's health or emotional development.

**Finding 8.** That O'Dell intends to completely deny McMurtry possession of or access to the children.

CR 159-60.

An additional finding of fact not supported by legally or factually sufficient evidence is as follows:

That McMurtry is a parent of a parent of the children and that a parent of the children has been incarcerated in jail or prison during the three-month period preceding the filing of the petition; found by a court to be incompetent; is dead; or does not have actual or court-ordered possession of or access to the children.

CR 169-70.

## ISSUE #9

The trial court erred by entering judgment based on findings that were not supported by the evidence.

10

## STATEMENT OF FACTS

O'Dell and Jene were divorced pursuant to a Final Decree of Divorce filed of record on August 19, 2004. CR 5. The decree designated both of them as joint managing conservators of the two children born of the marriage, A.B.O. and E.B.O., with Jene granted the exclusive right to designate the primary residence of the children and O'Dell ordered to pay child support. CR 2, 11. This order remained in place and governed the parties' possession and access to the children as well as child support until such time as the temporary orders requested by McMurtry were entered. CR 81; RR 125.

Following the divorce, O'Dell worked at Sara Lee then Earth Grains, and the children were covered by Blue Cross Blue Shield. RR 128, 222. At the time of the final hearing, O'Dell worked for J. Skinner making $27.00 per hour and the girls were covered on the company health insurance. RR 128-29, 222. In addition to being financially stable, O'Dell maintains a stable home for his children, which is completely paid for. RR 239, 282. O'Dell and his common law wife, Tonya Tackett, have a child together, now 19 years old. RR 130, 285. O'Dell paid child support and bought clothes for A.B.O. and E.B.O. as well as carrying them on his employer's health insurance. RR 131-32, 223. Any accumulated arrearages for child support by O'Dell were attributable to a period of time in which he was off

11

work due to a serious car wreck wherein he was hit by a drunk driver and suffered through two back surgeries. RR 183-84, 88.

During the years following the divorce, O'Dell never missed a weekend or visitation period with his children. RR 133, 230. O'Dell picked them up at school and worked with the girls' mother to swap out weekends when necessary. RR 134. The mother's drug use problems did not become apparent to O'Dell until CPS began an investigation in November 2012, regarding concerns about the mother's use of methamphetamine along with her boyfriend's drug and alcohol use. RR 61. No removal petition was ever filed by the department as a result of the investigation based on the grandmother having filed for custody and O'Dell being involved with his girls. RR 61-2. A department investigator met with Jene who agreed to allow her mother, McMurtry, to supervise her possession time with the girls. RR 62. O'Dell also agreed that McMurtry could supervise the mother's time of possession with the girls. RR 63. O'Dell advised the department that he had "joint custody" with the mother and was told he should see an attorney. RR 65. With Jene's permission, the department allowed McMurtry to take the girls to her home on the day CPS visited Jene at Matt Keller's. The CPS representative indicated that the department never got far enough into the investigation to make a decision on placement of the girls with their father because the mother had designated the

12

grandmother to supervise her time of possession with the girls. RR 68-71. The only concern ever cited by the department in not having turned the children over to O'Dell was his own admission that he had smoked marijuana in the past when the children were not around. RR 68. However, O'Dell alleviated those concerns by providing the department with a negative drug test result. RR 68. O'Dell never consented to have the children permanently placed with McMurtry but was okay with CPS sending them to McMurty's house after the CPS visit because as he told CPS, he had worked well with McMurtry in the past and would just go pick up the girls over there. RR 157-58, 234. The night after the first contact between CPS and Jene, O'Dell, along with a Sheriff's Department officer, attempted to pick up his children from McMurtry, but she refused to let the girls leave and O'Dell eventually left the house without them. RR 160, 223. McMurtry disputes this saying she was not home that night. RR 223. Later, sometime during Christmas 2012, O'Dell again took an officer with him and attempted to pick up the children, but McMurtry and her husband refused to let them leave and not only verbally attacked O'Dell but McMurtry's husband also tried to physically assault him. RR 160-61. Finally, McMurty refused O'Dell's possession time during Martin Luther King Day in relation to when the girls were to be returned home as well as during Spring Break. RR 162.

Prior to the time of suit, for approximately eight years, the girls lived with their mother and her then boyfriend, Ron Wiggins until sometime in March or April of 2012. RR 148-49, 204, 207. O'Dell was notified by Jene that she and the girls were moving in with McMurtry as she often did throughout the years in between boyfriends. RR 149, 200-02. Sometime after moving in with McMurtry, the girls' mother became involved with Matt Keller. RR 150. In reference to living with Matt Keller, O'Dell believed the girls and their mother were living with McMurtry but that Jene would go out of town with Keller occasionally or that she and the girls would go over and spend the night at his place. RR 156. McMurtry contended that Jene was not living with her at all but admitted the girls, particularly E.B.O., would go see their mother at Matt Keller's and stay overnight. RR 209.

In addition to picking up and dropping off of the girls at school, O'Dell would pick up and drop off the girls at other locations including Ronnie Wiggins' house, his mother's house, and the Shell station in Blossom. RR 150. Those involved in the pick-up and drop off included Jene, O'Dell and his wife Tonya, Matt Keller, McMurtry, and others. RR 150. Even as late as October 2012, Jene was picking up the girls or having Matt Keller or McMurtry pick them up. RR 151. The girls and their mother frequently called O'Dell wanting to know if the girls could come and stay at his house even if it was not his weekend. RR 151. Before the CPS

14

involvement, O'Dell and McMurtry would talk at times, and McMurtry would facilitate discussions between O'Dell and Jene when O'Dell was unable to talk to Jene without her "blowing up". CR 151. Both O'Dell and McMurtry cited their ability to work well together. RR 153, 234. Jene still sees the girls and even rides with McMurtry to take the girls to school. RR 228, 244. The relations between the O'Dell and McMurtry became strained around Thanksgiving of 2012 following an incident in which one of the girls decided not to stay for her Thanksgiving visit with O'Dell. RR 154. After arriving at O'Dell's home, A.B.O. attempted to leave at which point O'Dell grabbed her arm and pulled her aside to talk to her away from McMurtry and explain that it was his weekend because he had previously swapped weekends with Jene. RR 154. Despite his pleading with her, A.B.O. went back home with McMurtry, but E.B.O. chose to stay with O'Dell as planned. RR 155.

Both girls are involved in a wide range of activities including several rodeo associations and school sports such as basketball, volleyball, and softball. RR 165. O'Dell attends events when he is off work and while in his care the girls have only missed or been late to one rodeo scheduled by McMurtry, and this was simply due to a conflict with O'Dell's grandfather's funeral. RR 166. The girls both attend school in Chisum, and one of the girls missed a few games due to grades. RR 166.

15

The girls saw at least two counselors, including Ronikaye Rusak, a private counselor and Kathy Floyd, the court-appointed counselor. RR 16-58; 90-123. Prior to the filing of suit, the children's mother, Jene, who served as the joint conservator with the right to designate the primary residence of the children, had never been incarcerated, never even been in jail, was still alive, and was still seeing her children regularly. RR 172. Moreover, neither parent has had their parental rights terminated. RR 173. And, both parties agree that O'Dell never denied McMurtry access to the children, instead working well with her to cooperate and schedule visitation times. RR 174, 234, 311. Both parties and the counselors agreed that O'Dell needs to bond more with his girls. RR 176.

Although McMurtry alleged that continued appointment of the parents as joint managing conservators would not be in the best interest of the children because the appointment would significantly impair the children's physical health or emotional development, she could not explain why to the court. CR 52. Instead, she stated only that the girls have told her they "do not want to live there" and want to live with her because they just "don't do anything" over there, referring to O'Dell's home. RR 210, 211. McMurtry's focus, presumably in relation to filing suit, was getting them "out of that mess" with their mother, not their dad. RR 211. Although McMurtry referenced the stability of her home and her bond with the children, she

16

could cite nothing more than E.B.O.'s concerns about continuing to take piano lessons if she lived with her dad and getting to go to rodeos. RR 219. McMurtry denied any concerns at all regarding potential physical harm to the girls by their father and no need for supervised visitation. RR 236. McMurtry's contention was simply that it was not in the girls' best interest to have their father be appointed as sole managing conservator because she was better suited to provide stability and emotional support, again stating, "the girls do not want to live with their father." RR 210, 236. As to impairment of their emotional development, McMurtry simply argued "they don't want to go." RR 210, 236.

## SUMMARY OF THE ARGUMENT

The trial court violated O'Dell's fundamental right to make decisions concerning the care, custody, and control of his own children when the court improperly applied the standing and modification statutes, appointing McMurtry as a joint managing conservator with the exclusive right to determine the primary residence of the children.

Moreover, McMurtry lacked standing to sue for custody - i.e., sole managing conservatorship, joint managing conservatorship, or possessory conservatorship of the children - under Texas Family Code §§ 102.003 and 102.004. The trial court erred and abused its discretion in appointing McMurtry joint managing conservator with the right to designate the primary residence of the children given that McMurtry had no standing to pursue the relief she sought.

McMurtry had the burden to prove by a preponderance of the evidence that continued appointment of O'Dell as a joint managing conservator of the children would significantly impair the children's physical health or emotional well-being. McMurtry presented no evidence of the same and failed to meet her burden of proof as to proving significant impairment. The trial court erred in finding that the "evidence" was legally and factually sufficient to meet the standard to exclude an otherwise fit father from sole conservatorship.

18

Likewise, McMurtry failed to overcome the presumption that a parent acts in the best interest of the parent's children as required by Tex. Family Code § 153.433(2). McMurtry presented no evidence of the father's failure to act in his children's best interest.

Comparatively, McMurtry also failed to prove that modification of the prior order and her appointment as a joint managing conservator with the right to determine the primary residence of the children was in the best interest of the children.

Therefore, the Trial Court erred and abused its discretion in granting McMurtry conservatorship over the objection of an otherwise fit father. Finally, the trial court abused its discretion in drawing legal conclusions in reliance upon findings of fact unsupported by the evidence.

In light of the trial court's numerous errors, this Court should reverse and render a judgment appointing O'Dell the sole managing conservator with the exclusive right to designate the residence of the children and appoint Jene as possessory conservator with her periods of possession and access supervised by McMurtry.[9]

---

9 Tex. R. App. Proc. §43.2.

## ARGUMENT AND AUTHORITIES

### STANDARD OF REVIEW

Because of the fact sensitive nature of these important cases a trial court's determinations of conservatorship and access are reviewed under the abuse of discretion standard. An abuse of discretion occurs when a trial court acts without reference to any guiding principles or rules.[10] In *Chavez v. Chavez,* the Eighth Court of Appeals held that "if a trial court draws an incorrect conclusion of law by misapplying the law to the facts and the controlling findings of fact do not support a correct legal theory sufficient to support the judgment, an abuse of discretion would be shown."[11]

Just as the trial court can err in building up to its final judgment it can also abuse its discretion by improperly evaluating the usefulness of the evidentiary blocks upon which its findings of fact are based. The court in *In re: S.W.H.*, held that although legal and factual insufficiency are not points of error on their own, they are factors to be considered when determining whether an abuse of discretion has occurred.[12] Legal sufficiency is the minimum amount of evidence that a trial court can use to build the foundation of its judgment. When determining whether

---

10 *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238 (Tex. Sup. 1985), cert. denied, 476 U.S. 1159 (1986).

11 *Chavez v. Chavez,* 148 S.W.3d 449, 457 (Tex. App. – el Paso 2004, *no pet.*).

12 *In the Interest of S.W.H.*, 72 S.W.3d 772,776 (Tex. App. – Fort Worth 2002, *no pet.*).

the evidence is legally sufficient the reviewing court considers only the evidence that tends to support the trial court's judgment. Therefore, the reviewing court looks at the narrowest or smallest amount of evidence to determine whether the findings are sufficient to support the judgment. The court in *Brigham v. Brigham*, held that a trial court's finding is legally insufficient if there is no more than a mere scintilla of evidence to support it.[13] The evidence consists of no more than a scintilla when it is so weak that it creates no more than a mere surmise or suspicion of the fact's existence.[14] The Court in *In re: S.W.H.,* stated that a fact finder may not infer an ultimate fact from evidence that merely gives rise to any number of inferences.[15]

Reviewing a finding for factual insufficiency allows the reviewing court to look at a broader base of evidence. To determine whether evidence is factually sufficient to support a trial court's finding, the reviewing court must consider the body of evidence as a whole including all contrary evidence.[16] If the reviewing court analyzes the evidence and determines that the trial court's finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust, the reviewing court must find that the trial court abused its discretion and

---

13 *Brigham v. Brigham*, 863 S.W.2d 761, 762 (Tex. App. – Dallas 1993, *no writ*).
14 *Id*.
15 *In re S.W.H.,* at 778.
16 *Brigham,* at 762.

21

find in favor of the Appellant.[17]

Reviewing courts must give great deference to a trial court's determinations of fact especially when they are heavily based upon the evaluation of the demeanor and credibility of witnesses, which cannot be derived from a dry reading of the record.[18] Just because the reviewing court must give deference to the trial court with regard to evaluations of credibility and demeanor does not mean that the reviewing court must abdicate its duty to evaluate the structural soundness of the trial court's judgment. Likewise, it is entirely appropriate for the reviewing court to evaluate the quality of the evidence relied upon by the trial court when it reached the judgment to make certain that it is not based on a pile of "what ifs". And, even if the evidence is minimally sufficient, the trial court must make certain that the trial court's evidence is correctly balanced. Even though the trial court is given great discretion in determining the best interests of a child, it is bound by the strictures of precedential and statutory guidelines. The best interests of the child are always the end goal in custody cases, but before the trial court can reach a best interest test in custody cases between a parent and a nonparent it must first apply the parental presumption. When a trial court fails to properly apply the law to the fact situation presented or does not effectively utilize the evidence, the trial court may have

---

17 *Id.*
18 *In re Herd*, 537 S.W.2d 950, 952 (Tex.App. – Amarillo 1976, writ ref'd n.r.e.).

22

abused its discretion.

## ISSUE #1

**The trial court's application of the Texas family law statutes in this matter violated O'Dell's constitutional rights as a parent of the children.**

One of the most deeply embedded constitutional rights in this country is a parent's fundamental right to make decisions concerning the care, custody, and control of his or her children and that "so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family."[19] The Texas Supreme Court likewise has held that "the natural right which exits between parents and their children is one of constitutional dimensions."[20] Likewise, the courts of appeal in Texas have held that "these parental interests are a fundamental right protected by the Due Process Clause of the Fourteenth Amendment to the United State Constitution."[21]

The power of a trial court to adjudicate disputes between a parent and a non-parent, and to enforce its own orders contrary to a parent's decisions concerning his children, constitutes state involvement that implicates the parent's fundamental liberty interests in the care, custody, and control of his children.[22] Correct and strict

---

19 *Troxel v. Granville*, 530 U.S. 57, 66, 68 (2000).
20 *Southwestern Bell Telephone Co. v. Garza,* 164 S.W.3d 607, 622 (Tex. 2004).
21 *In re Russell,* 321 S.W.3d 846, 856-7 (Tex.App. – Forth Worth 2010, no pet.)(citing *In re Pensom*, 126 S.W.3d 251, 254 (Tex.App. – San Antonio 2003, orig. proceeding).
22 *See Troxel*, 530 U.S. at 65-76; *In re Scheller*, 325 S.W.3d 640 (Tex. 2010) (following *Troxel*

interpretation of statutes infringing upon a parent's rights helps ensure that a parent's constitutional rights are not needlessly interfered with through litigation.[23]

The Texas Legislature codified this fundamental right in the Texas Family Code in the form of a statutory presumption.[24] Thus, when a Texas trial court faces the choice between appointing a parent and a nonparent as managing conservator of a child in an original custody proceeding, the statutory mandate of the State of Texas dictates that the child's parents shall be appointed over the nonparent except in one of two extreme circumstances.[25]

One of those extreme circumstances arises when the nonparent presents evidence sufficient to support a finding that it is not in the child's best interest to appoint the parent as a managing conservator because the appointment would significantly impair the child's physical health or emotional development.[26] Or, the nonparent could show that the parent voluntarily relinquished care, control, and possession of the child to the nonparent of a period of one year or more, a portion of which was within 90 days preceding the date of intervention in or filing of the suit,

---

and ordering mandamus to set aside trial court's allowing grandparent access to children in temporary orders).

23 *See, generally, Pensom*, 126 S.W.3d at 255 (correct judicial interpretation in the grandparent access context "serves to ensure that the statutory scheme is narrowly tailored so that a parent's personal affairs are not needlessly intruded upon or interrupted by the trauma of litigation by any third party seeking access").

24 Tex. Fam. Code 151.131.

25 *Id.*

26 *Id*.

AND that the appointment of the nonparent is in the best interest of the child.[27]   The only other possible avenue through which a nonparent can overcome the parental presumption is by obtaining a finding of family violence which does not rebut the parental presumption but rather removes the requirement of rebutting the presumption completely.[28]

Here, the granting of possession and access and appointment of the maternal grandmother as a joint conservator with the right to determine the primary residence of the children not only goes against Texas case precedent but is also in derogation of the legislative intent forged in the requirements of Texas law and the Fourteenth Amendment's Due Process Clause as required by the U.S. Supreme Court in *Troxel v. Granville*.[29]   There, Justice O'Connor noted that a grandparent's right to visitation has no historic roots in the common law but rather is legislated creature of the late twentieth century.[30]

The court in *Svoboda v. Svoboda*, explained that in light of *Troxel*, section 153.433 now requires that a grandparent seeking court-ordered possession or access overcome the presumption that a parent acts in his or her child's best interest, meaning that the grandparent must prove by a preponderance of the evidence that

---

27  Tex. Fam. Code 153.004.
28  *Chavez*, 148 S.W.3d at 455
29  530 U.S. 57, 120 S. Ct. 2054 (2000).
30  *Id.*

denial of access to the child would significantly impair the child's physical health or emotional well-being.[31] The court in *Svoboda* further explained that "this high threshold exists so that a court will refrain from interfering with child-rearing decisions made by a parent simply because the court believes that a 'better decision' could have been made."[32] Under the statute, a trial court must presume that a fit parent acts in his or her child's best interest, and the court abuses its discretion if it grants access to a grandparent who has not met this standard.[33] The Texas Supreme Court has interpreted *Troxel* to mean that when there is no evidence that (1) the child's parent is unfit; (2) the child's health or emotional well-being would suffer if the court defers to her decisions; and (3) the parent intended to exclude the grandparent's access completely, a trial court abuses its discretion by granting grandparent access against the parent's wishes.[34]

In *Svoboda*, Appellant argued that the *Mays-Hooper* analysis applied and that the paternal grandparents failed to overcome the presumption that she acted in the children's best interest, and that the trial court's order granting the grandparents possession and access was therefore an abuse of discretion.[35] The appeals court

---

31 NO. 03-09-00189-CV (Tex.App.-Austin, 2009)(citing Tex. Fam. Code § 153.433(2); *In re Derzapf,* 219 S.W.3d 327, 333 (Tex. 2007)).
32 *Svoboda*, supra (quoting *In re J.P.C.,* 261 S.W.3d at 337).
33 *Svoboda*, supra (citing *Derzapf*, 219 S.W.3d at 333).
34 *Svoboda*, supra (citing *In re Mays-Hooper*, 189 S.W.3d 777, 778 (Tex. 2006) (per curiam)).
35 *Id.*

agreed, holding that the record established that Appellant was a fit parent and noting that the trial court expressly found that she did not intend to exclude the grandparents' access to the children completely.[36] Moreover, the court of appeals explained that there was no support for the claim that the children's physical health or emotional well-being would be significantly impaired if the court deferred to Appellant's decision to impose certain limitations on the grandparents' visitation.[37]

In the present case, as will become evident in the sections that follow on Issues 2 – 9 herein, like the grandparents in *Svoboda*, McMurtry did not have standing to pursue the relief she sought therefore the court lacked jurisdiction. Likewise, under the *Mays-Hooper* analysis, McMurtry did not prove that (1) Odell was unfit; (2) the children's health or emotional well-being would suffer if the court deferred to O'Dell's decisions; and (3) that O'Dell intended to exclude her access completely. As such the trial court abused its discretion and violated O'Dell's constitutional rights by granting McMurtry's petition for intervention and naming her joint managing conservator with the right to determine the primary residence of the children against the O'Dell's wishes.

**ISSUE #2**

**The trial court erred as a matter of law, concluding that McMurtry had standing to sustain her intervention and obtain modification of the prior order.**

36 *Id.*
37 *Id.*

27

McMurtry lacked standing to sue for custody - i.e., sole managing conservatorship, joint managing conservatorship, or possessory conservatorship of the children - under Tex. Family Code §§ 102.003 and 102.004. The trial court erred and abused its discretion in appointing McMurtry joint managing conservator with the right to designate the primary residence of the children given her lack of standing under both the general and specific standing provisions.

Texas Family Code § 102.004(b) states that "[a]n original suit requesting possessory conservatorship may not be filed by a grandparent or other person." Moreover, section 102.004(b) only allows the court to grant a grandparent with substantial past contact with the child "leave to intervene" in a pending suit if the court finds that appointment of a parent as a sole managing conservator or both parents as joint managing conservators would significantly impair the child's physical health or emotional development. In this case, however, there was no pending suit and Appellant was not found to be unfit to be appointed sole managing conservator for the children. The trial court erred in granting McMurtry standing to pursue conservatorship as she failed to establish in the pleadings or at the temporary orders hearing or at trial that she had a right to possession and access under the statute.

Likewise, McMurtry pled for sole conservatorship, stating that appointment

of the parents as joint conservators would not be in the children's best interest because such appointment would significantly impair the children's physical health or emotional development. CR 51-54. However, she failed to include any basis for her standing to pursue the relief sought other than being the biological grandparent of the children.[38] A court order granting possession of or access to a child by a grandparent requires proof that the grandparent requesting possession of or access to the child is parent of a parent of the child and that parent of the child: (A) has been incarcerated in jail or prison during the three-month period preceding the filing of the petition; (B) has been found by a court to be incompetent; (C) is dead; or (D) does not have actual or court-ordered possession of or access to the child.[39]

McMurtry conceded in testimony that she did not establish a right to possession and access under the statute. In fact, she established just the opposite via her own testimony wherein she confirmed that her daughter, the children's mother, is indeed still alive, has never been declared judicially incompetent, never been incarcerated, and was previously named joint managing conservator of the children with O'Dell and given the right to determine the girls' primary residence. RR 229-30. Accordingly, the trial court's order awarding McMurtry joint conservatorship of the children cannot be upheld as McMurtry lacked standing to even pursue the

---

38 *Id.*
39 Tex. Fam. Code 153.433

relief sought, which the court awarded.

## ISSUE #3

**The trial court erred as a matter of law, concluding that McMurtry has overcome the presumption that a parent acts in the best interest of the parent's children by proving that the denial of possession of or access to the children would significantly impair the children's health and emotional well-being.**

In *In re J.P.C.*, the mother and father filed for divorce and temporary orders were entered with the mother named as sole managing conservator and the father as possessory conservator with periods of possession to be supervised by his mother and grandmother of the child.[40]   At the time of filing, the father was living with his mother. The father died prior time of divorce and the grandmother filed an original petition for grandparent access.[41]   The trial court signed an order granting the grandmother possession and access but on appeal by the mother, the court of appeals reversed and rendered, holding that the grandmother did not prove by a preponderance of the evidence that denial of access would harm the child's physical or emotional well-being to overcome the statutory presumption that the mother was acting in the child's best interest.

Although Texas Family Code 153.433 does not mention best interest, section 153.002 of the code dictates that the best interest of the child shall always be the

---

40 261 S.W.3d 334 (Tex.App. – Fort Worth 2008, no pet. h.)
41 *Id.*

primary consideration of the court in determining the issues of conservatorship and possession of and access to the child. And, section 153.433 presumes that a parent acts in the child's best interest, and it permits a grandparent to obtain court-ordered access only upon a showing that denial of access would "significantly impair the child's physical health or emotional well-being." The grandparent's opinions in *In re J.P.C.* and those of non-expert witnesses who stated that the grandmother should be granted access did not overcome the statutory presumption and that such testimony did not support the court's interference with the mother's parental rights by awarding the grandmother court ordered access to the child.[42]

Likewise, in *In re Chambless*, the trial court appointed a mother sole managing conservator and the father as possessory conservator with the father's parents to supervise the father's visitation.[43] The father was killed in a motorcycle accident and his parents filed a petition seeking visitation, claiming that the child would be significantly harmed if he did not know the father's side of the family.[44] During the course of the proceedings, the trial court issued an interim visitation order, allowing the grandparents visitation with the child over the mother's objection. The mother sought a writ of mandamus and the Supreme Court granted

---

42 *In re J.P.C.,* 261 S.W.3d at 339.
43 257 S.W.3d 698 (Tex. 2008) (per curiam).
44 *Id.*

the same, holding that the trial court abused its discretion by not allowing the mother the opportunity to cross examine a social worker who submitted a report, stating that it would "very detrimental" to the child's emotional well-being or to present evidence to the contrary at the temporary orders hearing.[45]

In doing so, the Supreme Court explained that grandparent possession is governed by chapter 153 of the Texas Family Code and that a trial court abuses its discretion when it grants access to a grandparent who has not proven by a preponderance of the evidence that denial of possession of or access would significantly impair the child's physical health or emotional well-being.[46] Finally, the Supreme Court concluded that the trial court abused its discretion in awarding the grandparents temporary visitation without affording the mother a meaningful opportunity to be heard. The Court noted that the mother argued that if given the chance to be heard at the temporary hearing, she would have presented evidence that grandparent visitation was not in the child's best interest.[47]

Here, the trial court made a finding that the presumption was overcome and that denial of access to the grandmother would significantly impair the child's physical health or emotional well-being. The problem is the finding was not

---

45 *Id.*
46 *Id.*
47 *Id.*

supported by the evidence McMurtry brought before the court. In fact, a look at the evidence actually presented by the parties here shows quite the opposite as will be discussed again in the attack upon the fact findings by the trial court in this matter below. For instance, there was absolutely no evidence to show that O'Dell had ever denied McMurtry access to the children and in fact, as both sides testified to, O'Dell and McMurtry had worked together quite well to make sure she saw the children. RR 135, 152, 157, 234. The only acrimony in their relationship developed after the CPS investigation began regarding Jene, after which McMurtry filed for custody then actually denied the children's father the possession and access to which he was already entitled under the court's previous orders. RR 160-63, 234, 278. For the trial court to have make and rely upon such a finding, McMurtry had to prove that O'Dell had denied her access in the past and intended to completely deny her from having possession of or access to the children in the future. There was simply no evidence of this presented on which the trial court could have based its finding and drawn such a conclusion.

For example, in *In re J.M.T.* the court of appeals held that the trial court erred by awarding the maternal grandparents court-ordered possession of the child under section 153.433 of the Family Code because, among other things, there was no evidence the paternal grandparents intended to deny the maternal grandparents

33

access to the child.[48]  Any order granting grandparent visitation, much less joint managing conservatorship, cannot survive the holding in *Troxel* if there is no evidence that the parent intended to completely exclude the grandparent's access.[49] In *In re J.M.T.*, the maternal grandparents argued the trial court abused its discretion by awarding the maternal grandparents court-ordered possession of the child.[50]  The appeals court found that that the maternal grandparents essentially agreed that the paternal grandparents had acted as the child's parents and had done a good job. Furthermore, both sets of grandparents had a good rapport regarding visitation with the children in the past, and it was evident that the paternal grandparents wanted the children to have a healthy relationship with the maternal grandparents and intended to continue giving them access to the children.[51]  Based on those facts, there was no evidence that the paternal grandparents intended to deny the other grandparents from having possession of or access to the child pursuant to the definition of section 153.433 of the Family Code.[52]

Here, the evidence or lack thereof to support the finding that O'Dell intended to deny McMurtry access to the children is quite similar to that of the instant case.

---

48  280 S.W.3d 490, 493 (Tex. App. – Eastland 2009, no pet.),
49  530 U.S. at 65.
50  280 S.W.3d at 493.
51  280 S.W.3d 490.
52  *Id.*

O'Dell testified that he often talked to McMurtry to find out about the children because their mother was erratic and just wanted to argue, and McMurtry would facilitate the conversation regarding visitation with the children for him. RR 135. There were simply times when he would call Jene, and she would blow up so he would call McMurtry to talk to her about swapping weekends or whatever the issue was and always felt like that he and McMurtry worked together pretty well. RR 135, 152, 157. In fact, the relationship worked so well that when O'Dell arrived on the scene to pick up the girls at the outset of the CPS investigation and discovered they had already been released to McMurtry, he told the caseworker that he and McMurtry had a pretty good relationship and that he would just pick up the girls from her place. RR 157. Coincidently, it was not McMurtry that was denied access to the children, it was O'Dell who was denied access to his own children by McMurtry even though he had never missed a period of visitation with his children in nine years. RR 160, 278. This happened during Christmas and even though he took a sheriff's officer with him, he was denied access to the girls by McMurtry and her husband. RR 161, 278. On Martin Luther King Day, McMurtry cussed O'Dell and threatened that he better have the girls back at her house at a certain time even though the court order stated that he was to have the children until school on Tuesday morning. RR 162. Also, he was denied picking the girls up at his court ordered

time on Spring Break. RR 161. O'Dell had seemingly worked fine with McMurtry until the start of the CPS investigation and the suit she filed, then it all "went out the window." RR 163.

Finally, O'Dell testified that he still has no problem with McMurtry, and she can see the children any time, adding that he would not preclude his girls from seeing her because they have a relationship with her, she's their grandmother. RR 174. Even McMurtry herself testified that prior to CPS getting involved that she and O'Dell were the two that discussed the alternating periods of possession even with Jene and that her relationship with O'Dell did not become strained until after she filed her suit. RR 234.

In addition, O'Dell's wife, Tonya Tackett, testified that O'Dell had never refused to return the children to McMurtry when the girls were staying with McMurtry instead of Jene. RR 280. Moreover, Tackett stated that O'Dell had ever bad mouthed McMurtry in front of the girls because he knows they love their Nana. RR 280. Likewise, Jackie O'Dell, the paternal grandmother of the children reiterated that O'Dell had never once expressed to her that he would exclude McMurtry from the girls. RR 311. A.B.O. stated that she remembered overhearing her father and McMurtry talking about scheduling visitation and swapping weekends and the like. RR 373. And finally, Ms. Floyd, the court appointed counselor stated

36

that follow up questions with the girls during her sessions with them revealed that the girls, although they had some concerns initially, did not believe their father would ever keep them away from their grandmother. RR 114.

Therefore, based on the lack of evidence and the improper findings in the record that O'Dell intended to deny McMurtry possession of or access to the children and the evidence to the contrary that he had never denied her access in the past, any such conclusion of law that he intended to do so is clear error and an abuse of discretion.

## ISSUE #4

**The trial court erred as a matter of law, concluding that appointment of O'Dell as sole managing conservator or continuing to have both parents as joint managing conservators would significantly impair the children's physical health or emotional development.**

## ISSUE #5

**The trial court erred as a matter of law, concluding that naming McMurtry as a joint managing conservator of the children is in the best interest of the children.[53]**

## ISSUE #6

**The trial court erred as a matter of law, concluding that naming McMurtry as the conservator with the exclusive right to designate the primary residence of the children is in the best interest of the children.[54]**

---

53 This Conclusion was amended from the Trial Court's original #4 pursuant to the Amended Findings of Fact and Conclusions of Law. CR 169.

54 The Trial Court's Findings of Fact and Conclusions of Law included a duplicate provision numbered as both paragraphs "4" and "5" under the Conclusions of Law section. CR 161.

**The trial court erred as a matter of law, concluding that modification of the prior order establishing conservatorship and possession or access to the children is in the best interest of the children.**

McMurtry has simply not met the burden to prove that her being appointed a joint managing conservator with the exclusive right to designate the primary residence of the children is in the best interest of the children. This is a stringent burden. As Findings 4 – 7 each involve the best interest standard, Appellant will analyze those together to avoid repetition.

McMurtry's desire and even the desires of the children to live with her is not enough for the court to hang its hat on over the objection of O'Dell without significant evidence of impairment to those children. Although the section governing grandparent possession and access under Texas Family Code section 153.433 does not mention best interest, section 153.002 dictates the best interest of the child <u>shall</u> always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child. To establish the child's best interest, McMurtry should have presented evidence, addressing certain factors the court could consider including factors from *Holley v. Adams*.[55] These factors fall roughly into three categories such as (1) caring for the child; (2)

---

[55] 544 S.W.2d 367, 371-72 (Tex. 1976).

maintaining family relationships; and, (3) parental fitness.

Although both parties presented evidence of their ability to care for the children, each party also agreed that neither of them posed a physical or emotional danger to the children now or in the future. RR 235 Here, key differences presented by the parties on this factor centered on the parties' ability to meet the physical and emotional needs of the children, the stability of the home, cooperation between the parties, parenting skills, and McMurtry's claim to having been a caregiver for the children on a more frequent basis. RR 105, 108, 128, 135, 138, 144, 152, 157, 174, 200-05, 208, 218, 223-24, 234, 236-39, 251-54. As to O'Dell's commitment to and care for the children, the court heard unchallenged testimony that the only time in nine years he missed visitation with his children was when McMurtry and her husband denied him access. RR 133, 138, 152-53, 278.

When looking at factors as to how family relationships can best be maintained, a trial court should address the child's preference, geographic proximity, and the extent to which each party can encourage, accept, and promote relationships between the child and the other party. Here, in relation to the ability to maintain family relationships, the evidence was clear from the parties own testimony as well as from other individuals that O'Dell and McMurtry worked well together in figuring out visitation times for the children prior to the suit and that the situation only became

strained afterwards.

In the realm of parental fitness, there were no allegations or real evidence of O'Dell having a history of abuse or family violence, no history of past or present child neglect, no evidence of physical or sexual abuse directed toward the children, unfitness, instability, or any other factors so as to preclude O'Dell from directing where his own children should live on a daily basis. In fact, the one and only mention of drug or alcohol abuse included an instance of O'Dell having a beer in the children's presence and a one-time admitted use of marijuana after which he tested negative. That did not and does not equate to a drug or alcohol abuse problem, whatsoever.

## ISSUE #8

Even if this Court determines that conclusions of law entered by the trial court were sufficient to support the judgment based on best interest and significant impairment, the trial court still abused its discretion by basing the conclusions of law on findings of fact that were premised upon legally and factually insufficient evidence. Appellant will review each of the trial court's findings of fact and relate how the lack of evidence, or in some cases, evidence to the contrary, does not support each finding and how the court erred in drawing legal conclusions and entering judgment based on findings not supported by the evidence.

**Finding 2.   That McMurtry had actual exclusive care, control and possession of the subject children for more than six months prior to filing her intervention.**

**Finding 2.   That McMurtry has effectively been the primary caretaker of the subject children for most of their lives.**

Child Protective Services investigator Sara Estrada testified that although she was not in a position to say how long the children had resided with McMurtry, O'Dell had informed the department that the girls had been with their grandmother only since Jene began staying with Matt Keller. RR 68-69.   O'Dell testified that the girls had been at their grandmother's home because he had dropped them off there and even spoken to McMurtry about working out details for visitation when he and Jene were unable to communicate and also testified affirmatively that for almost nine years the children and Jene lived at Bonham and the corner of 17th, with Ron Wiggins. RR 135-36.   O'Dell also testified that the girls had physically lived with their mother in the Paris Independent School District for the last nine years, but their mother had simply chosen to use McMurtry's address for school purposes so they could attend school at Chisum. RR 138-39.

Likewise, O'Dell stated that it was only after an altercation between Wiggins and Jene that she and the girls moved in with McMurtry sometime around March 2012. RR 148-49.   O'Dell's testimony at trial indicated that he actually had

41

visitation with the children in excess of what the Court had awarded him and that he never missed his visitation although he admitted that he sometimes had to consult McMurtry about the date and time because Jene could be hard to deal with and McMurtry would intervene. RR 152-53. And, when the Jene began dating Matt Keller, O'Dell testified that the girls never mentioned their mother living over there only that she would go out of town or spend the night with him and that as far as he knew the girls and Jene were living together at McMurtry's. RR 155-56.

Following the CPS intervention, there was no signed agreement for the girls to be permanently placed with McMurtry as both the CPS worker and O'Dell testified. RR 76-80, 157-58. In fact, the night O'Dell went to retrieve the children from McMurtry, he was refused and asked to leave. RR 160. He tried again on Christmas to pick up the girls and McMurtry again refused to let them leave and denied him access again at Spring Break. RR 160-61. The girls themselves testified that they were living with their mother when she was dating Ron Wiggins but would ask to go to their Nana's house although E.B.O., who A.B.O. described as a Momma's girl, would more often stay with her mother. RR 352. And, at Christmas 2012, they were with O'Dell for the holiday but staying more routinely with McMurtry because by that time their mother was staying a lot with Matt Keller. RR 353. A.B.O. testified that even when she was at her mom's house, her grandmother

42

was still the one taking them to school. RR 354. A.B.O. further stated that she and her sister were still staying with their mother, just not often, and she had no idea if her Dad knew they were really staying with their grandmother most of the time. RR 355-56. E.B.O. testified that even when her mother was dating Matt Keller, they were still staying with their mother approximately one night per week but mostly stayed with McMurtry although they still went to O'Dell's place on Thursdays. RR 400-01. E.B.O. also testified that she and her sister would always go back to their mother's house even after staying at McMurtry's and that some days their mother picked them up from school and other days McMurtry picked them up. RR 403. E.B.O. also testified that even when her sister would go to McMurtry's house to stay she would stay with her mother, back when she was dating Ron Wiggins, because she liked playing with his daughter. RR 405. Any judgment based on these findings is improper.

**Finding 4. That the subject children have little bond with their father, O'Dell.**

To the contrary, O'Dell testified that in nine years he had never missed a weekend with his children and that his children love him and that he knows they love him by the way they act when they are with him. RR 133, 138, 153. O'Dell and his wife both testified that the girls would call and ask if they could stay with him on weekends when it was not even his possession time. RR 151, 237, 277.

43

Even McMurtry stated that the girls have always gone to visit their father and that she is aware they do in fact do things together like going to Broken Bow for Spring Break, going to the Monster Truck show, and attending a lot of the girls' events together as a family. RR 237-38. In addition, Nancy Brem testified that she had observed the girls and their father at the Red River County Stew Cook-off and that he was attentive and engaged with the girls. RR 263. O'Dell's wife testified that when the girls are at their house, the family watches movies together, spends time with other family members and that she and the girls go shopping and get their nails done. RR 271. She indicated the girls have a great relationship with their father and appear to be happy. RR 271-72, 281.

Another witness, Greg Simpson, testified that O'Dell always had family activities planned with the kids to go places, to take them fishing, canoeing, and trips. RR 296. Simpson's observations were that O'Dell seemed to be a very caring parent worried about his children and that the girls appear to be very happy around him and involved in whatever he's doing. RR 299. Jackie O'Dell testified that the relationship between O'Dell and the girls is good and that he loves and cares for them. RR 306, 310. Finally, Kathy Floyd, the court appointed counselor who met with O'Dell, McMurtry, and the girls testified that the girls were sweet and wanted to please everyone and although they love their grandmother, they also love their

father. RR 98. Floyd also stated that although the girls may have not appeared to be as close to their father as their grandmother, it was simply because there had been some distance not having lived with him on a continual basis. RR 113.

Any judgment stating that O'Dell had no bond with his children is improper and contrary to the evidence presented to the court.

**Finding 5. That McMurtry executed and attached an affidavit on knowledge and belief that contained, along with supporting facts, the allegation that denial of possession of or access to the children would significantly impair the children's physical health or emotional well-being.[56]**

**Finding 6. That the facts stated in the affidavit were true and were sufficient to support the relief requested.**

Although the trial court found that McMurtry executed and attached an affidavit along with supporting facts relative to her allegation that denial of possession or access to the children would significantly impair the children's physical health or emotional well-being, the only so-called "affidavit" was the verification at the end of the initial pleading for intervention signed by McMurtry. CR 54. There was no separate Affidavit detailing any supporting facts whatsoever regarding her allegations. In fact, the pleading itself failed to even include factual support relative to the allegations. CR 51. Pursuant to the Texas Family Code, the

---

56 The Trial Court's Findings of Fact and Conclusions of Law contained two paragraphs numbered as "5". CR 159-60.

petitioner must execute and attach a significant impairment affidavit on knowledge or belief that contains (1) an allegation that denial of possession of or access to the child by the petitioner would significantly impair the child's physical health or emotional well-being; and, (2) supporting facts.[57]

The court must deny the relief sought and dismiss the suit if the court determines that the facts stated in the affidavit, if true, would not be sufficient to support the relief authorized under Family Code 153.433. For instance in *In re Sullender*, the grandmother's affidavit did not establish denial of access, mother's unfitness, or that the children's health or well-being would be significantly impaired therefore the reviewing court held that the trial court abused its discretion by not dismissing the suit.[58]

Here, the abuse is even more glaring: (1) There was no separate affidavit; (2) There were absolutely no supporting facts to show that the children's health or well-being would be significantly impaired as alleged. The relief requested even on a temporary basis should have been denied and the suit dismissed either on motion of O'Dell or *sua sponte* by the trial court itself at the outset based on McMurtry's lack of standing. Moreover, any finding that such an affidavit existed or included such supporting details is wholly inaccurate and an abuse of discretion.

---

57  Tex. Fam. Code 153.432(c).
58  No. 12-12-00058-CV (Tex. App. – Tyler 2012, orig. proceeding)(memo op; 7-11-12).

46

Therefore, any judgment based on a finding relative to an affidavit that does not even exist would logically be improper.

**Finding 7. That naming O'Dell as the conservator with the exclusive right to determine the primary residence of the subject children would significantly impair the children's health or emotional development.**

It bears repeating here that not one scintilla of evidence or even a supporting fact was presented by McMurtry in her initial pleading to the court on which to proceed with suit or to obtain temporary orders much less an order appointing her as a joint conservator with the right to determine the primary residence of the children on the basis that it would significantly impair their health or emotion well-being to have their father appointed in that capacity. Proving significant impairment is required to rebut the presumption that a parent acts in a child's best interest.[59]

The significant impairment standard also applies when a grandparent files an original SAPCR seeking managing conservatorship or intervention as in this case. Although the differences would normally be relatively nuanced, pursuant to Texas Family Code §153.433(a)(2), in a suit for access and possession, a grandparent must

---

59 Tex. Fam. Code 153.433(a)(2); *see In re Scheller*, 325 S.W.3d 640, 642 (Tex. 2010); see, e.g., *In re A.N.G.*, No. 02-09-006-CV (Tex.App. – Fort Worth 2010, no pet.)(memo op,; 1-21-10)(evidence that grandchildren were accustomed to spending time with grandparents and wanted to see them more often was insufficient to show that break in relationship might significantly impair the children); *see also In re J.P.C.*, 261 S.W.3d 334,339-40 (Tex. App. – Fort Worth, no pet.) (grandparents' "feelings and speculations" were not sufficient to rebut fit-parent presumption).

prove that denial of access to the child would significantly impair the child's physical health or emotional well-being. In comparison, pursuant to section 102.004(a)(1), in a suit for managing conservatorship, a grandparent must show that an order is necessary because the child's current circumstances would substantially impair the child's physical health or emotional development. And, under section 102.004(b), intervention for possessory conservatorship, the grandparent must show that appointment of one parent as sole managing conservator or both parents as joint managing conservators would substantially impair the child's physical health or emotional development.

Here, the evidence, if any, is wholly insufficient for the court to make this finding. Floyd, the court appointed counselor conducted counseling sessions with both O'Dell and McMurtry and had no concerns about O'Dell physically abusing the children or impairing the girls' physical health. RR 94. In fact, she agreed under questioning that the girls themselves had never expressed any concerns about their father "being abusive or mean to them or anything along those lines." RR 94. In fact, there was nothing that stood out to Floyd about O'Dell that would concern her as to him causing impairment to his children's emotional development. RR 95. Furthermore, Floyd testified that she had no concerns about O'Dell being granted the right to determine the primary residence of the girls in relation to their physical

48

health and emotional development. RR 96. Floyd further testified that even McMurtry never expressed concerns to her about O'Dell's ability to provide for the girls physical health and only "a little bit" of concern about him being able to care for their emotional development. RR 105. That concern was essentially related to their grandmother being female and the children being female and just having a natural connection. RR 105. Moreover, Floyd testified that if O'Dell were awarded primary there would be an adjustment period, but so long as the girls were able to continue a good solid frequent relationship with their grandmother . . . they would not be irreparably harmed living with the father. RR 105-06, 115.

Although Appellant will not review all of the testimony on his own behalf related to how his appointment as the primary conservator of the children would not impair their health or emotional well-being, a few points are important to highlight evident from the transcript of the all of which has been documented previously herein: O'Dell loves his children; he has never missed his visitation periods with his girls; he pays his child support and buys them clothing and other necessities; he attends their school events and other extra-curricular activities; he has a stable home life with his wife and a house that is paid for and a good paying job; he has demonstrated an ability to cooperate with both the mother and the grandmother to arrange visits with the children and promote the relationship between the girls and

49

other family members; he attended the court ordered counseling sessions; he plans family outings with the girls; the girls are integrated into the family life of O'Dell and his wife; and, he has been willing to allow the girls to finish school at Chisum where they are now located as opposed to switching schools. RR 128-29, 131-133, 135, 138,142, 144, 151-53, 157, 160-61, 174, 222-23, 230, 237-39, 263, 270-73, 280, 282.    He has never had his parental rights terminated, he contested the CPS placement with the grandmother, has never done anything directed towards the girls to impair their physical health or been abusive to them or done anything that would impair their emotional well-being. RR 173, 238.

In summary, O'Dell testified that he is the father of these girls, he loves them, he wants them, has not been proven to be unfit to raise these girls and deserves to have his children with him. RR 174.   And, he reiterated to the court that the only way he can build a closer bond with these girls is to be the primary conservator and have them live with him, which he believes to be in the girls' best interest. RR 176.

Even McMurtry could not pinpoint any specific basis or evidence to support her contention that the girls would be physically harmed or emotionally impaired by being with their father.   In fact, McMurtry agreed that O'Dell has a stable home and good job. RR 239.   She also testified that she had no concerns about them being physically harmed and that O'Dell should continue to have possession and access to

50

the children. RR 235, 238. In contrast, the only information that she could provide as to why she should be appointed primary conservator is because she believed that she was "comparatively far better suited to provide the girls with stability and emotional support and because the girls don't want to live with their father."[60] RR 236. When asked to explain that further and to elaborate on how, other than because "they don't want to go," living with O'Dell would impair the girls' emotional development, McMurtry could point to nothing specific on which to base her conclusion other than the girls just need to bond more with O'Dell. RR 237.

Therefore, any judgment based on a finding relative to significant impairment if O'Dell were to be appointed as the conservator with the right to determine the girls' primary residence is improper.

**Finding 8. That O'Dell intends to completely deny McMurtry possession of or access to the children.**

There is simply no evidence on which the trial court could have based this finding. For the trial court to have made such a finding, McMurtry had to prove that O'Dell intended to completely deny her from having possession of or access to the children. For example, in *In re J.M.T.*, the trial court erred by awarding the

---

60 The mere opinion of the grandparents themselves as interested, nonexpert witnesses that they should be granted access does not overcome the statutory presumption imposed by section 153.433, nor does it support the court's interference with a parent's rights. *In re J.P.C.*, 261 S.W.3d at 340.

maternal grandparents court-ordered possession of the child under Texas Family Code § 153.433 because among other things there was no evidence the paternal grandparents intended to deny the maternal grandparents' access to the child.[61] Any order granting grandparent visitation, much less joint managing conservatorship, cannot survive the holding in *Troxel* if there is no evidence that the parent intended to completely exclude the grandparent's access.[62]

In *In re JMT* case, the maternal grandparents argued the trial court abused its discretion by awarding the maternal grandparents court-ordered possession of the child.[63] The appeals court agreed finding that the maternal grandparents essentially agreed that the paternal grandparents had acted as the child's parents and had done a good job, that they all had a good rapport and relationship regarding visitation with the children in the past, that the paternal grandparents wanted the children to have a healthy relationship with and continued permitting the maternal grandparents access to the children.[64] Based on those facts, there was no evidence that the paternal grandparents intended to deny the other grandparents from having possession or access to the child pursuant to the definition of section 153.433.[65]

---

61  280 S.W.3d 490, 493 (Tex. App. – Eastland 2009, no pet.).
62  530 U.S. 37, 65, 120 S. Ct. 2054.
63  280 S.W.3d 490.
64  *Id.*
65  *Id.*

Here, the evidence or lack thereof to support the finding that O'Dell intended to deny access to McMurtry are quite similar to that of the instant case. O'Dell testified that he often talked to McMurtry to find out about the children because Jene was erratic and just wanted to argue so McMurtry would facilitate the conversation, regarding visitation with the children for him. RR 135. There were simply times when he would call Jene, and she would blow up so he would call McMurtry to talk to her about swapping weekends or whatever the issue was and always felt like that he and McMurtry worked well together and that he did everything he could to work with her. RR 152. In fact, the relationship worked so well that when O'Dell arrived on the scene to pick up the girls at the outset of the CPS investigation and discovered they had already been released to McMurtry, he told the investigator that he and McMurtry had a good relationship and that he would just go pick up the girls from her place. RR 157.

In reality, O'Dell is the party that was denied access to his own children by McMurtry even though previously he had never missed a period of visitation with his children in nine years. RR 160, 278. This happened during Christmas and even though he took a sheriff's officer with him, he was denied access to the girls by McMurtry and her husband. RR 161, 278. Then, on Martin Luther King Day

53

McMurtry cussed O'Dell and threatened that he better have the kids back at her house at a certain time even though the court order stated that he was to have the children until he released them at school on Tuesday morning. RR 162. Again, he was denied picking them up at the ordered time on Spring Break. RR 161. O'Dell worked fine with McMurtry until the CPS investigation began and she filed suit then according to O'Dell, it all "went out the window." RR 163. Finally, O'Dell testified that he still has no problem with McMurtry and that she can see the children any time. RR 174. He added that he does not intend to preclude his girls from seeing McMurtry because they have a relationship with her and she is their grandmother. RR 174. Even McMurtry testified that prior to CPS getting involved, she and O'Dell were the two that discussed the alternating periods of possession with Jene and that her relationship with O'Dell did not become strained until after the suit was filed. RR 234. O'Dell's wife testified that O'Dell had never refused to return the children to McMurtry when she was keeping them instead of Jene nor has he ever bad mouthed McMurtry in front of the girls because he knows they love their Nana. RR 280. Likewise, Jackie O'Dell, the paternal grandmother of the children reiterated that O'Dell had never once expressed to her that he would exclude McMurtry from the girls. RR 311. A.B.O. stated that even she overheard her father and McMurtry talking about scheduling visitation and swapping weekends and the

54

like. RR 373. Finally, the court appointed counselor stated that during her sessions with the girls they did not believe their father would ever keep them away from their grandmother despite their earlier concerns. RR 114.

Therefore, in light of the lack of evidence in the record that O'Dell intended to deny McMurtry possession or access to the children and the evidence to the contrary that he never had or nor ever intended to deny McMurtry possession or access to the children, any such finding that he intended to do so is improper.

> **Additional Finding: That McMurtry is a parent of a parent of the children and that a parent of the children has been incarcerated in jail or prison during the three-month period preceding the filing of the petition; found by a court to be incompetent; is dead; or does not have actual or court-ordered possession of or access to the children.**

Prior to the filing of the lawsuit by McMurtry, the children's mother had never been incarcerated for three months or in jail for any period of time, had never been declared judicially incompetent, was still alive, and was still seeing the kids regularly. RR 229-30. Moreover, O'Dell testified that neither he nor the children's mother ever had their rights terminated. RR 173.

Therefore, any judgment based on this finding is improper.

**ISSUE #9**
**The trial court erred by entering judgment based on findings that were not supported by the evidence.**

The legal and factual sufficiency of findings of fact are relevant factors in assessing whether the trial court abused its discretion. When an abuse of discretion standard of review applies to a trial court's ruling, findings of fact and conclusions of law aid the appellate court in reviewing the propriety of the ruling by providing the appellate court with an explanation for the ruling.[66] In reviewing factual sufficiency points of error in support of the judgment, the court considers all of the evidence to determine whether the findings are so against the great weight and preponderance of the evidence as to be manifestly unjust.[67]

Here, the explanation as to the trial court's ruling is flawed in that the court reached conclusions of law built upon findings of fact not supported by the overwhelming weight of the evidence, or in some case, no evidence at all, as outlined above in the findings. Therefore, the judgment cannot stand and should be reversed in favor of Appellant.

---

[66] *In re J.P.C.*, 261 S.W.3d at 336.
[67] *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951).

**CONCLUSION AND PRAYER**

The U. S. Supreme Court, the Texas Supreme Court, the Texas Family Code, and Texas case law require the court to defer to O'Dell, as a fit parent who acts in the best interest of his children, unless the McMurtry can first meet the standing requirements to even bring suit then overcome the applicable parental presumptions and prove significant impairment by a preponderance of the evidence. Here, there was little or no substantive or probative evidence presented by McMurtry to support the trial court's ruling.

The trial court erred and abused its discretion on numerous levels, including its failure to dismiss the suit at the outset based on McMurtry's lack of standing, which resulted in a lack of jurisdiction. The court then improperly appointed McMurtry as a joint managing conservator with the right to determine the primary residence even though she failed to meet her burden of proof to overcome the parental presumption or prove significant impairment to the children if O'Dell were appointed as sole managing conservator.

These errors by the court violated the O'Dell's fundamental right to make decisions concerning the care, custody, and control of his own children. Improperly denying a parent a fundamental right definitely results in reversible error, regardless of other findings and conclusions of law. Because the trial court abused its

discretion and reached an improper result, this Court must reverse the decision of the trial court and appoint O'Dell the sole managing conservator of the children with the right to determine to the primary residence of the children and Jene as possessory conservator with McMurtry to supervise Jene's possession and access to the children.

Correction of the egregious abuse of discretion will not significantly impair the childrens' physical health or emotional well-being as the evidence demonstrated that O'Dell had never deprived McMurtry from seeing the girls in past and did not intend to deprive her from seeing the children in the future. McMurtry should simply rely on O'Dell's clear ability to cooperate and foster a relationship between she and girls just as any other grandparent does.  In fact, removal of McMurtry as a joint conservator will not prevent her from continuing on as the involved caring grandparent she has always been. Alternatively, should the Court see fit to allow McMurtry possession and access, it should be based on the possession and access granted to Jene whose time should still be supervised by McMurtry.

Appellant prays that the Sixth Court of Appeals finds that:

A. Appellant's fundamental right to make decisions concerning the care, custody, and control of his children was violated when the trial court erred when it abused its discretion by appointing McMurtry joint conservator

with the exclusive right to determine the primary residence of the children.

B. Appellee did not have standing for conservatorship and that the Trial Court erred appointing McMurtry as joint conservator with the exclusive right to determine the primary residence of the children.

C. Appellee did not meet her burden of proof and that the trial court erred and abused its discretion in granting McMurtry as joint conservator with the exclusive right to determine the primary residence of the children when she failed to overcome the parental presumption and prove by a preponderance that the children would suffer significant impairment if she were not appointed as a conservator.

Appellant prays the Sixth Court of Appeals reverse the trial court's judgment in whole and render the judgment the trial court should have rendered denying McMurtry's petition for intervention and appointing O'Dell as the sole managing conservator of the children and the children's mother, Jene, appointed possessory conservator with her periods of possession and access to be supervised by McMurtry.

Respectfully submitted,

By: /s/Brent M. Langdon
Brent M. Langdon
State Bar No. 11902250
blangdon@ldatty.com
Lisa McPherson
State Bar No. 24062883
lisam@ldatty.com

**LANGDON✶DAVIS, L.L.P.**
5902 Summerfield, Ste. A
P.O. Box 5547
Texarkana, Texas 75503
Phone (903)223-3246
Fax (903)223-5227

*Attorneys for Appellant, David O'Dell*

# CERTIFICATE OF SERVICE

This is to certify that on January 7, 2015, a true and correct copy of the above and foregoing brief has been forwarded via the court's electronic filing system to all counsel/parties of record listed below and to the trial judge via First Class U.S. Mail:

**Appellee's Appellate Attorney**
John R. Mercy
MERCY CARTER TIDWELL, LLP
1724 Galleria Oaks Dr.
Texarkana, Texas 75503

**Appellee's Trial Attorney**
Chad Cable
Chad Cable Law Offices
323 Gilmer St.
Sulphur Springs, TX 75482

**Trial Judge**
Honorable Bill Harris
Lamar County Court at Law
Courthouse, 119 North Main Street
Paris, Texas 75460

/s/Brent M. Langdon
Brent M. Langdon

**ELECTRONIC CERTIFICATION**

I hereby certify that I have filed electronically, Appellant's Brief in a searchable non-scanned PDF format. I further certify that the file has been scanned for viruses and that it is virus free.

/s/ Brent M. Langdon
Brent M. Langdon

**CERTIFICATE OF COMPLIANCE**

This brief complies with the typeface and length limitations of the Texas Rules of Appellate Procedure. Excluding the parts of the brief exempted by the rules, Appellant's Brief contains 11,081 words. This brief was produced on a computer with conventional proportionally-spaced typeface, including serifs, using Microsoft Word, in 14-point type except for footnotes, which are formatted in 12-point type.

/s/ Brent M. Langdon
Brent M. Langdon

Dated: January 7, 2015